No. 98-307

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 89

294 Mont. 181

979 P.2d 193

IN RE MARRIAGE OF

KATHY ANN FOREMAN,

Petitioner and Respondent,

and

RONALD R. FOREMAN,

Respondent and Appellant.

No

APPEAL FROM: District Court of the Sixteenth Judicial District,

In and for the County of Rosebud,

The Honorable Dale Cox, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Kevin T. Sweeney; Sweeney & Healow, Billings, Montana

For Respondent:

John Houtz, Attorney at Law, Forsyth, Montana

Submitted on Briefs: November 19, 1998

Decided: April 27, 1999

Filed:

_____

Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

**¶1. Ronald R. Foreman (Ronald) appeals from the order of the Sixteenth Judicial District Court, Rosebud County, in which the court dissolved the marriage of Ronald and Kathy Ann Foreman (Kathy) and equitably divided the parties' marital assets and debts. We affirm.**

Issues Presented

**¶2. We rephrase the issues on appeal:**

**¶3. 1. Did the District Court err in including Ronald's inherited interest in the Nebraska farm in the marital estate?**

**¶4. 2. Did the District Court err in its valuation of Ronald's interest in the Nebraska farm?**

**¶5. 3. Did the District Court err in awarding the tax dependency deduction to Kathy?**

Factual and Procedural History

**¶6. Ronald and Kathy were married in 1978. The parties have one minor child; their other**

child is emancipated. At the time of filing for dissolution, Kathy had been employed for approximately ten years as a paralegal and currently earns an annual salary of $17,400. In

addition to her salary, she receives free automobile licensing from her employer because she utilizes her car for business purposes, and an annual Christmas bonus equivalent to two weeks of pay. However, Kathy receives no medical insurance, retirement benefits, or overtime pay from her employer. Kathy possesses a high school degree and paralegal certification, and has no intention of pursuing any higher education.

**¶7. Ronald works as a health system administrative specialist for the federal government, and earned $55,201 annually at the time of trial.[1] In addition to his salary, Ronald receives health insurance, life insurance, and civil service retirement benefits from his employer. Ronald is also self-employed and earns supplemental income from his side-business of woodworking.**

**¶8. Over the course of their nineteen-year marriage, the couple frequently moved around the United States. Most of these moves were for purposes of Ronald's career advancement. Due to these frequent moves, Kathy was never able to secure employment with any long-term benefits and, thus, she presently has no vested retirement assets. In the recent past, the couple resided in Miles City and enjoyed a comfortable, middle-income lifestyle. Throughout the marriage, Kathy has been the primary caretaker of the parties' two children and the couple's minor child continues to reside principally with Kathy.**

**¶9. Approximately one year after the couple was married, Ronald's father died. His will left to Ronald's mother a life estate in the 300-acre family farm, located in Nebraska (the Nebraska farm). Under the terms of the will, Ronald and each of his two sisters received an undivided one-third interest in the remainder of the Nebraska farm, subject to their mother's life estate. According to a probate appraisal, the Nebraska farm was valued at $688,830 at the time of the death of Ronald's father in 1979. At trial, Ronald alleged that, approximately one year after the death of his father, he and his sisters deeded to their mother the most valuable five acres of the Nebraska farm, which included the family house, all the outbuildings, and the irrigation wells. Ronald maintained that this transfer accounted for 25% of the total value of the Nebraska farm. Ronald and Kathy have never lived on the Nebraska farm, received any income from the farm, nor made any tax or business contributions to the farm.**

**¶10. Ronald and Kathy did not accumulate any significant marital savings or investments because they treated the Nebraska farm as a retirement asset. This**

allowed them to live, as the District Court concluded, "a very comfortable if not somewhat extravagant lifestyle." However, it also resulted in the marital estate being substantially dissipated over the course of the couple's marriage. According to Kathy, Ronald justified these sizeable expenditures on the grounds that his inheritance of the Nebraska farm would enable the couple to pay off their marital bills in the future. Kathy apparently relied upon these representations in allowing all of her income to be spent in pursuit of the couple's comfortable lifestyle without saving for her retirement.

¶11. At trial, Kathy requested that the court take account of the value of the Nebraska farm in ruling upon her request for marital property in lieu of maintenance. Upon filing for dissolution, Kathy thus employed the services of an accounting firm to provide a valuation report for Ronald's remainder in the Nebraska farm. This firm calculated that Ronald's one-third remainder interest subject to his mother's life estate has a "present value" of $149,874. However, this appraisal was done without knowledge of the alleged transfer of five acres to Ronald's mother and, therefore, failed to account for the presumed decrease in value to Ronald's inheritance in the Nebraska farm.

¶12. The District Court accepted Kathy's request to consider the Nebraska farm in apportioning the marital estate, noting that the couple had intended to "save it for retirement." Since Ronald and Kathy had treated the Nebraska farm "as a retirement or savings account which allowed them to spend all of their combined incomes without regard to savings," the court concluded that Kathy had contributed to the maintenance of the property over the course of the couple's marriage. Despite Ronald's testimony concerning the transfer to his mother, the District Court accepted Kathy's expert's valuation of the Nebraska farm at $149,874, because Ronald failed to submit any credible evidence concerning the value of the five acres allegedly transferred to his mother. Thus, the court concluded that the Nebraska farm should be apportioned wholly to Ronald, in return for a cash payment of $45,000 from Ronald to Kathy.[2] This cash payment was intended by the District Court to be in lieu of maintenance, and was supported by the determination that Kathy's present income is insufficient to provide for her reasonable needs. With the $45,000 cash payment in lieu of maintenance taken into account, the net value of the marital estate apportioned to Kathy was $95,955, while the net value of the marital estate apportioned to Ronald was $96,781.

¶13. Kathy and Ronald both filed Montana Child Support Financial Affidavits in the original dissolution proceeding. On her affidavit, Kathy claimed herself and the couple's minor child as a tax exemption; on his affidavit, Ronald claimed only himself. Although the District Court did not expressly award the tax dependency deduction to either party in its dissolution order, the court calculated child support based upon the assumption--as indicated by the parties in their financial affidavits-- that Kathy would claim the minor child as an exemption. Following trial, Ronald moved to amend the District Court's dissolution decree, requesting that the court award him the tax deduction. In this post-trial proceeding, the District Court commented that it "did not, in the final decree, address the issue of tax exemption, but indicated in the Child Support Guidelines that Petitioner should be allowed to claim the minor child as a tax exemption on her federal and state income tax returns." After noting that Kathy is the primary residential custodian of the minor child and concluding that none of the exceptions found in § 139 of the 1997 U.S. Master Tax Guide applied in Ronald's favor, the court expressly granted Kathy the tax dependency deduction. Ronald appeals.

## Standard of Review

¶14. On appeal, this Court reviews a trial court's division of marital property to determine whether the findings upon which the court relied are clearly erroneous and whether the court correctly applied the law. In re Marriage of Danelson (1992), 253 Mont. 310, 317, 833 P.2d 215, 219-20. In reviewing discretionary trial court rulings, including marital estate distributions and the valuations of marital property pursuant to dissolution, we determine whether the district court abused its discretion. In re Marriage of Rada (1994), 263 Mont. 402, 405, 869 P.2d 254, 255. Other standards of review will be set forth as necessary.

## Discussion

¶15. 1. Did the District Court err in including Ronald's inherited interest in the Nebraska farm in the marital estate?

¶16. Ronald asserts that the District Court erred in concluding that the Nebraska farm should be included in the marital estate and apportioned among the parties because the court misapprehended controlling law and failed to make specific factual findings that Kathy has a need for maintenance and that Ronald has the financial

ability to afford such maintenance.

¶17. First, Ronald argues that the District Court improperly relied upon In re Marriage of Meeks (1996), 276 Mont. 237, 915 P.2d 831. In *Marriage of Meeks*, the wife argued that the trial court erred in refusing to include the husband's inherited interest in a testamentary trust in the marital estate because the interest was vested. This Court disagreed and affirmed the trial court's conclusion that the husband's remainder interest in the testamentary trust was contingent and, therefore, was properly excluded from the marital estate. *See Marriage of Meeks*, 276 Mont. at 244-46, 915 P.2d at 835-36.

¶18. Ronald contends that his remainder interest in the Nebraska farm is "quite similar" to the husband's interest in the testamentary trust at issue in *Marriage of Meeks* and, thus, should have been excluded from the marital estate. However, Ronald fails to demonstrate how his interest is in fact similar to the contingent remainder at issue in *Marriage of Meeks*. Indeed, early in his brief, Ronald maintains that he holds a "vested interest subject to divestment" in the Nebraska farm. Similarly, the District Court concluded, citing *Marriage of Meeks*, that Ronald's remainder interest created by his father's will is a "vested interest," which should be included in the marital estate. We agree.

¶19. A will is a revocable instrument that does not take effect until the death of its maker. *See* McReynolds v. McReynolds (1966), 147 Mont. 476, 480, 414 P.2d 531, 533. Upon the death of Ronald's father, the will thus became effective and Ronald became an ascertainable person in being whose right to share in the remainder of the Nebraska farm is not dependent upon the occurrence of some future event. Only if Ronald predeceases his mother, will his vested remainder be divested and pass to his sisters. Thus, Ronald's remainder interest is vested subject to divestment and, provided that he outlives his mother, he is certain to inherit at least a one-third remainder interest in the Nebraska farm. *See Marriage of Meeks*, 276 Mont. at 244, 915 P.2d at 836.

¶20. Recently, in In re Marriage of Beadle, 1998 MT 225, __ P.2d __, 55 St. Rep. 943, we sought to clarify this area of the law. There, we stated the general rule "that only a vested remainder may be considered in evaluating the opportunity for future acquisition of assets or income under § 40-4-202, MCA, and that even where the interest is vested, the intent of the testator can render it contingent." *Marriage of*

*Beadle*, ¶ 36; *see also Marriage of Meeks*, 276 Mont. at 245, 915 P.2d at 836 (testator's clear intent "can preserve as contingent a remainder which otherwise would be deemed to have vested"). Here, the schedule of distribution for the will provides that Ronald is to receive "[a]n undivided 1/3 interest in all real estate owned by William A. Foreman on date of his death subject to life estate of [Ronald's mother]." This shows a clear intent by Ronald's father that the remainder in the Nebraska farm vest upon "his death," subject only to being divested by virtue of Ronald failing to outlive his mother, the holder of the preceding life estate. We conclude that the District Court properly applied *Marriage of Meeks* to the facts of this case.

¶21. Second, Ronald suggests that the District Court incorrectly applied In re Marriage of Binsfield (1995), 269 Mont. 336, 888 P.2d 889. The District Court cited *Marriage of Binsfield* for the proposition that, in deciding whether to include property inherited during the marriage in the marital estate, a trial court "must consider the contributions of the other spouse, including the nonmonetary contribution of a homemaker, the extent to which such contributions have facilitated the maintenance of the property, and whether the property division serves as an alternative to maintenance arrangements." *Marriage of Binsfield*, 269 Mont. at 343, 888 P.2d at 893 (citing § 40-4-202(1), MCA). Ronald does not dispute these general principles, but argues that they were not met in this case because Kathy "admittedly provided no contribution whatsoever, either in an economic or non-economic sense, to the acquisition or maintenance of the Nebraska property." In further support of his position, Ronald cites the recent decision of In re Marriage of Engen, 1998 MT 153, 961 P.2d 738, 55 St. Rep. 595, in which this Court emphasized that under § 40-4-202, MCA, "regardless of who holds title, preacquired or gifted property need not be included in the marital estate unless the nonacquiring spouse contributed to its preservation or appreciation." *Marriage of Engen*, ¶ 29; *see also* In re Marriage of Hogstad (1996), 275 Mont. 489, 499, 914 P.2d 584, 590.

¶22. This argument deserves some attention. At trial, Kathy admitted that she had never directly contributed to the maintenance of the Nebraska farm. Indeed, neither Ronald nor Kathy ever paid any tax or business expenses associated with the Nebraska farm. Nor did either party introduce evidence showing that the Nebraska farm had appreciated in value since the death of Ronald's father in 1979. Kathy responds, nonetheless, that the Nebraska farm was properly treated as marital property because the marital estate was substantially dissipated in reasonable reliance upon Ronald's representations that his inheritance would enable the couple

to pay their sizeable marital bills when they decided to retire. We agree.

¶23. Trial courts, acting in equity, are granted far-reaching discretion to fashion "a fair distribution of the marital property using reasonable judgment and relying on common sense." In re Marriage of Rock (1993), 257 Mont. 476, 480, 850 P.2d 296, 298; *Marriage of Danelson*, 253 Mont. at 317, 833 P.2d at 220. By statute, a district court is empowered to "equitably apportion between the parties the property and assets belonging to either or both, however and whenever acquired and whether the title thereto is in the name of the husband or wife or both," and in so doing, is required to "consider the contribution or dissipation of value of the respective estates" of the parties. Section 40-4-202(1), MCA (emphasis added). With respect to inherited property, a district court "shall consider" the contributions of the nonacquiring spouse to the marriage, including:

(a) the nonmonetary contribution of a homemaker;

(b) the extent to which such contributions have facilitated the maintenance of this property; and

(c) whether or not the property division serves as an alternative to maintenance arrangements.

Section 40-4-202(1), MCA. We conclude that the District Court judiciously applied § 40-4-202, MCA, to the circumstances of this case, and that its decision to include the Nebraska farm in the marital estate was based upon an equitable ground that serves to distinguish this case from a strict application of the rule emphasized in *Marriage of Engen*.

¶24. In its order, the District Court found:

The parties enjoyed a very comfortable standard of living in Miles City, Montana commensurate with the utilization of all of their income for the family's needs and comforts with little to no income saved. It appears to the Court that a very substantial share of the parties' income was spent for the purchase and replacement of vehicles, furniture and sporting and recreational activities. As indications of this, the parties traded vehicles at least 32 times in ten (10) years; purchased a motor home, 50 inch television set

along with five other television sets, extensive tools and numerous credit card charges for clothing and household items. [Emphasis added.]

This finding is supported by substantial credible evidence. In accord with this finding, the District Court concluded that the Nebraska farm should be included in the marital estate:

Ron[ald] inherited the property approximately one year after the parties were married in 1978. Thereafter during the marriage Kathy was a homemaker raising the parties' children. In addition, Kathy was gainfully employed during most of the marriage contributing her earnings for the benefit of the family and such contribution aided the parties to accumulate marital assets and to maintain a very comfortable if not somewhat extravagant lifestyle.

Kathy's contribution to the marriage both monetarily and non-monetarily facilitated the maintenance of the Nebraska property as follows: The parties treated this property, in effect, as a retirement or savings account which allowed them to spend all their combined incomes without regard to savings, intending to maintain and not invade the inherited property, but save it for retirement. In her testimony, Kathy stated that the parties never saved money, that Ron[ald] stated to her that when his mother died, they would be able to pay off all their bills, and his inheritance would be their ticket to retirement. [Emphasis added.]

**¶25. The underlying policy of equitable apportionment of marital assets would be thwarted by a wooden application of the rule emphasized in *Marriage of Engen* to deny Kathy her fair share of the value of the Nebraska farm. Ronald held his vested remainder interest in the Nebraska farm for eighteen years of the couple's marriage. Over the course of this time-period, the court specifically found that Kathy contributed to the maintenance of the property both nonmonetarily as a homemaker, § 40-4-202(1)(a), MCA, and monetarily as a second earner for the family. Most importantly, the District Court's findings and conclusions demonstrate that Kathy detrimentally relied upon Ronald's representations that the Nebraska farm would enable the couple to pursue a "somewhat extravagant lifestyle" without saving for retirement.**

**¶26. This Court has long recognized that, "[i]f none of the value of the [inherited] property is a product of contribution from the marital effort, the District Court can**

justifiably find that the non-acquiring spouse has no interest in the property." In re Marriage of Herron (1980), 186 Mont. 396, 404, 608 P.2d 97, 101. With some refinement, this Court has recently emphasized that "the nonacquiring spouse is entitled to an equitable share of the <u>appreciated or preserved value</u> which is attributable to his or her efforts." *Marriage of Engen*, ¶ 29 (emphasis added); *see also* In re Marriage of Smith (1995), 270 Mont. 263, 268, 891 P.2d 522, 525 (contributions of nonacquiring spouse must either maintain or increase the value of the inherited property).

¶27. While it is true that Kathy did not contribute directly to the Nebraska farm, the record demonstrates that the couple justified the assumption of high marital debts upon the fact that they intended to <u>preserve the value</u> of Ronald's inheritance in the Nebraska farm for retirement. Therefore, in contributing as a homemaker and in allowing her earnings to be entirely dissipated in reliance upon Ronald's inheritance in the Nebraska farm, Kathy effectively--albeit indirectly--"facilitated the maintenance" of that property and, accordingly, should be entitled to an equitable share of its <u>preserved value</u>. Section 40-4-202(1)(b), MCA; *see also* In re Marriage of Gallagher (1991), 248 Mont. 100, 103, 809 P.2d 579, 581.

¶28. Despite the Dissent's criticisms to the contrary, the value of the Nebraska farm was preserved because, all other things being equal, the couple presumably would have had to borrow against the value of Ronald's vested remainder interest in that farm in order to sustain their lifestyle. Having not had to mortgage or otherwise diminish the value of Ronald's interest in the farm, the entire value of that remainder interest has thus been preserved. That is, Kathy's nonmonetary and monetary contributions to the family's upscale lifestyle enabled the couple to leave the value of Ronald's vested remainder in the farm--whatever that precise value may be-- unburdened by debt or other obligation, thereby allowing the couple to preserve or maintain the <u>full value</u> of that asset for the future (i.e., for their retirement).

¶29. Moreover, we disagree with Ronald's contention that the Nebraska farm could not be awarded to Kathy in lieu of maintenance unless the court first made specific findings that she has a need for maintenance and that he possesses the financial ability to pay such maintenance. The District Court properly considered the fact that Kathy requested a share of the value of the Nebraska farm in lieu of maintenance. Section 40-4-202(1)(c), MCA. In this case, both the record and the court's factual findings as a whole support its conclusion that "[a]lthough Kathy is gainfully

employed, her income is insufficient to support herself taking into consideration her reasonable needs and the standard of living she experienced while married." Absent maintenance or marital property in lieu thereof, the District Court thus determined that Kathy "would not have sufficient property to provide for [her] reasonable needs." We conclude that the District Court did not abuse its discretion in granting Kathy marital property in lieu of maintenance.

¶30. In wholly granting the Nebraska farm to Ronald, the District Court provided Ronald with the option of paying the $45,000 cash payment to Kathy according to a monthly installment plan, by taking a mortgage against his remainder interest in the Nebraska farm. The Dissent criticizes this reasonable solution by the District Court, claiming that there is "absolutely no basis in the record, nor common experience" for concluding that Ronald could obtain a mortgage on his vested remainder interest in the Nebraska farm to meet the requirements of the court's dissolution decree. However, there is a solid basis in the record for so concluding. Following issuance of the District Court's marital dissolution decree, Ronald requested that the court amend its order on the ground that he was not capable of mortgaging his interest in the farm because it is not owned solely by him and because he was unable to secure the assistance of his siblings in granting such a mortgage. The District Court rejected Ronald's claim as follows:

Although Respondent represented that his siblings would not assist in granting a mortgage, Respondent submitted no affidavits or other proof in support of his allegation. Moreover, Respondent submitted no legal authority requiring the assistance or consent of his siblings in order for Respondent to mortgage his undivided one-third (1/3) interest in the property. "As a general rule, anything or any interest capable of passing by purchase or descent is capable of being encumbered by mortgage." (emphasis added) [54A] Am. Jur. 2d, Mortgages, Section 34 [(1996)].

¶31. A "remainder" interest "dependent on a precedent estate," as here, "may be created and transferred" in Montana. Section 70-15-211, MCA. A vested remainder, being an actual estate, may be conveyed or mortgaged just like any other present interest in land. *See* 28 Am. Jur. 2d *Estates* § 316 (1966); 3 Thompson on Real Property, Thomas Edition § 23.16, at 360 (David A. Thomas ed., 1994). Thus, it should come as no surprise that this Court has previously held that, since a vested remainder subject to a preceding life estate "could be sold or otherwise alienated,

transferred or <u>mortgaged</u>," it has a "present value and should be included" in the marital estate. In re Marriage of Hill (1982), 197 Mont. 451, 459, 643 P.2d 582, 587 (emphasis added). As the above quote of the District Court demonstrates, Ronald <u>did not argue that there was any legal impediment to his mortgaging his remainder interest in the Nebraska farm</u>, and further failed to prove that obtaining such a mortgage was impractical or unreasonable under the circumstances. Presumably, had Ronald any sound basis for disputing the District Court's conclusion that his remainder interest was mortgageable, Ronald would have challenged that conclusion on appeal.

¶32. The District Court concluded that amortized monthly payments on the $45,000 figure would amount to $545.98--an amount approximately commensurate with Kathy's initial request at trial for $500 a month in maintenance from Ronald--and would thus ensure that "Kathy, with continued employment, will have a monthly income sufficient to provide for her reasonable needs, [such that] maintenance should not be awarded." In other words, the District Court impliedly addressed Ronald's ability to pay maintenance by affording him the option of paying the $45,000 sum over time, in a manner that would mimic monthly maintenance payments and cover Kathy's reasonable monthly needs. Indeed, with respect to Ronald's putative ability to pay, the Dissent conveniently overlooks the fact--in the record on appeal because of Ronald's post-trial motion to amend the District Court's order--that Ronald's annual salary has increased substantially since the date of the dissolution decree (from approximately $55,000 to $60,000). We hold that the Nebraska farm was properly included in the marital estate.

¶33. 2. Did the District Court err in its valuation of Ronald's interest in the Nebraska farm?

¶34. Having decided that the Nebraska farm was properly characterized as marital property by the District Court, we must now determine whether the court correctly valued that asset. A district court has ample discretion to determine the value of property in a marital dissolution proceeding. In re Marriage of Robinson (1994), 269 Mont. 293, 296, 888 P.2d 895, 897. The court may adopt any reasonable valuation finding support in the record, and "[i]ts valuation can be premised on expert testimony, lay testimony, documentary evidence, or any combination thereof." In re Marriage of Milesnick (1988), 235 Mont. 88, 94-95, 765 P.2d 751, 755.

¶35. Ronald asserts that the court erred because it ignored his testimony concerning the transfer to his mother of five acres allegedly comprising 25% of the value of the Nebraska farm and, therefore, that Kathy's expert appraisal failed to account for a 25% devaluation of his vested remainder interest. Kathy, while acknowledging at trial that this transfer presumably occurred, responds that Ronald offered no evidence other than his testimony at trial to substantiate the alleged value of that transfer. We agree.

¶36. At trial, Ronald testified that "the value of that five-acre parcel with all those buildings was probably equal to 25 percent of the total value" of the Nebraska farm. Contrary to Ronald's claim that the District Court abused its discretion because it did not give any specific reason for ignoring this testimony, the court specifically found as follows:

Ron[ald] testified that he and his sisters deeded back to Ron[ald]'s mother their remainder interest in five acres of the property which included all the buildings, house and irrigation wells. No documentary evidence was submitted however to support this testimony nor was any credible evidence submitted to the Court as to the value of these specific five acres.

¶37. As Kathy points out, parties to a dissolution proceeding have a duty to assist the trial court in acquiring information needed to determine an appropriate distribution of marital property. Downs v. Downs (1979), 181 Mont. 163, 165, 592 P.2d 938, 939. Where a party fails to introduce credible evidence of the value of a piece of marital property, a court is free to utilize credible evidence of value submitted by the other party. See In re Marriage of Powell (1988), 231 Mont. 72, 76, 750 P.2d 1099, 1102. Moreover, we have made it abundantly "clear that speculation, conjecture, inference, or guess do not constitute credible factual evidence." In re Marriage of Maedje (1994), 263 Mont. 262, 267, 868 P.2d 580, 584. A trial judge is not required to "become an appraiser, an accountant, a computer, and an all-around genius to appropriately decide the facts as established by the documentation given at trial." Downs, 181 Mont. at 165, 592 P.2d at 939. Although the Dissent emphasizes the fact that Kathy conceded at trial that the alleged transfer to Ronald's mother occurred, that fact is immaterial to our conclusion on this issue. Even assuming that the transfer did occur as Ronald alleged at trial, we agree with the District Court that Ronald nevertheless failed to prove the value of that transfer. We hold that, given Ronald's failure of proof regarding the actual value of the alleged transfer, the

District Court did not abuse its discretion in adopting Kathy's expert's appraisal of the present value of Ronald's remainder interest.

¶38. In the alternative, notwithstanding Ronald's failure of proof on the valuation issue, we conclude that the District Court's $45,000 figure is equitable under the facts of this case. Kathy's expert appraisal placed a discounted present value on Ronald's future interest of $149,874. The Dissent criticizes Kathy's appraisal for failing to account for the alleged 25% devaluation of Ronald's remainder interest as a result of the transfer to his mother. However, even assuming *arguendo* that the court should have reduced the value of Ronald's remainder interest by 25% to compensate for that alleged transfer, the $45,000 figure equitably achieves the very same result. Reducing Kathy's expert appraisal of the discounted present value of Ronald's remainder interest by 25% produces a figure of $112,405.50. Thus, even when reducing the discounted present value of Ronald's remainder interest in the Nebraska farm by 25%, the District Court's award of $45,000 amounts to <u>less than one-half (1/2) of that reduced value.</u>

¶39. In short, in awarding Kathy the $45,000, the court judiciously granted Kathy only the amount necessary to make her share of the marital estate equitable with that granted to Ronald under the dissolution decree. Without the $45,000 cash payment (or, in the alternative, an equivalent amount of maintenance), Kathy's share of the marital estate would only amount to approximately $50,000 in comparison to Ronald's $96,000-plus share of the estate. In light of the facts of this case--namely, that Kathy has no retirement assets while Ronald has a vested federal pension, and that Ronald's earning capacity is over three times that of Kathy's--such a result would be grossly inequitable.

¶40. 3. Did the District Court err in awarding the tax dependency deduction to Kathy?

¶41. We review a district court's award of a tax exemption for an abuse of discretion. In re Marriage of Schnell (1995), 273 Mont. 466, 471, 905 P.2d 144, 147. Ronald contends that the court misconstrued its authority by implying that it was duty-bound to award the tax dependency deduction to Kathy because she is the minor child's primary custodian. In the case principally relied upon by Ronald, *Marriage of Milesnick*, this Court sanctioned the discretionary power of a trial court to make a tax benefit allocation:

We hold that the assignment of dependency deductions is a factor that a district court may consider when ordering child support. It is not an abuse of discretion, however, for a district court to refuse to award the exemptions to either party.

. . . .

. . . A district court may assign the exemptions if it finds that the allocations will serve the best interests of the children and the parties.

*Marriage of Milesnick, 235 Mont. at 93-94, 765 P.2d at 754-55.*

**¶42. We hold that the District Court properly understood and acted within its authority, and did not abuse its discretion in initially declining to award the tax dependency deduction to either party, nor in expressly awarding the exemption to Kathy in response to Ronald's post-trial motion. As the District Court noted in its post-trial order, the general rule under federal law is that the primary custodial parent is entitled to the dependency deduction.** *See Marriage of Milesnick*, **235 Mont. at 93-94, 765 P.2d at 754-55. The financial affidavits submitted by the parties to the court indicated that Kathy was claiming the minor child, not Ronald. As the primary residential custodian of the parties' minor child, Kathy was by default entitled to the dependency deduction.**

**¶43. In sum, we hold that the District Court properly included Ronald's vested remainder interest in the Nebraska farm in the marital estate and correctly valued that interest. We further hold that the court did not abuse its discretion in awarding the tax dependency deduction for the parties' minor child to Kathy, the primary residential custodian of that child.**

/S/ W. WILLIAM LEAPHART

We concur:

/S/ J. A. TURNAGE

/S/ KARLA M. GRAY

/S/ JIM REGNIER

Justice Terry N. Trieweiler dissenting.

**¶44. I dissent from the majority's conclusions that the District Court did not err when it valued Ronald Foreman's interest in a Nebraska farm, and when it included that interest in the marital estate.**

**¶45. In our recent decision in *In re Marriage of Engen*, 1998 MT 153, 961 P.2d 738, 55 St. Rep. 595, we attempted to clarify years of inconsistent and result-oriented decisional law which pertained to the distribution of gifted, inherited, or preacquired property. However, with the ink barely dry on the *Engen* opinion, this decision now returns family law practitioners to a total state of uncertainty in this area of the law with another completely result-oriented approach to the issue.**

**¶46. In *Engen*, during our discussion of § 40-4-202, MCA, regarding the division of the marital estate, we noted that:**

We have previously construed this provision to mean that regardless of who holds title, preacquired or gifted property need not be included in the marital estate unless the nonacquiring spouse contributed to its preservation or appreciation. In that event, we have held that the nonacquiring spouse is entitled to an equitable share of the appreciated or preserved value which is attributable to his or her efforts.

*Engen,* ¶ 29.

¶47. In *Engen*, we reversed a judgment of the district court which included a condominium jointly titled to both spouses in the marital estate and then divided it equally because the evidence was that it had been purchased with the husband's gifted property and there was no evidence that its appreciated value was due to any contribution by the wife.

¶48. In this case, there was no evidence that Kathy contributed in any way to the preservation or appreciation of Ronald's remainder interest in his family's land in Nebraska. Nor was there any evidence that the value of the land had, in fact, appreciated or been preserved during the marriage.

¶49. In fact, all evidence was to the contrary. During the parties' nineteen years of marriage, there was no time when they lived on the property. They made no improvements to the property, nor did they make any financial contributions to the property's improvement or maintenance. During the sixteen years of the parties' marriage that Ronald had an actual interest in the property, they spent a combined total of one week on the property.

¶50. Therefore, based on our decision in *Engen*, and the numerous prior decisions cited in *Engen*, there was no basis for including Ronald's interest in the Nebraska farm in the marital estate. The majority's rationale for doing so is creative and may contribute to what it considers an equitable result; however, it is unsupported by any prior case law and, in fact, defeats the purposes for distinguishing between preacquired, gifted, or devised property when distributing marital assets.

¶51. The majority concludes that Kathy's efforts as a homemaker, and dissipation of the parties' earnings in reliance on Ronald's inheritance, somehow "facilitated the maintenance" of that property entitling Kathy to an equitable share of the "preserved value." However, the majority does not bother to explain how the value of the farm land was preserved. The inference is that the property might have otherwise been disposed of to support the same lifestyle which the District Court and the majority now characterize as extravagant. However, Ronald had no possessory interest in the property. The value and the condition of the property today is exactly what it would have been regardless of Kathy's services as a homemaker, and regardless of the parties' dissipation of their earnings. There is simply no rational

connection between the parties' lifestyle or Kathy's efforts, and the current value of the Nebraska farm land.

¶52. The majority also suggests that the value of the farm was preserved because "the couple presumably would have had to borrow against the value of Ronald's vested remainder interest in the farm in order to sustain their lifestyle." The majority's suggestion is based on the false assumption, with no basis in the record, that a lending institution would loan money against a future one-third interest in property without the cooperation of the owners of the other two-thirds interest. In spite of the fact that the assumption is unsupported in the record, and contrary to common sense and experience, the majority suggests that there is a solid basis in the record simply because Ronald failed to provide evidence, other than his own testimony, that he was unable to secure the assistance of his siblings in applying for such a mortgage. How much evidence is necessary? Who has more direct knowledge of his relationship with his siblings or their attitude about their interest in the property than Ronald? The fact is, Ronald's testimony not only makes sense, but it was uncontradicted.

¶53. The majority offers Am. Jur. 2d citations for the principle that a future interest in property is transferable as evidence that a lending institution will loan money based on a speculative future interest which is shared with others who have no interest in mortgaging it. This kind of purely academic approach in total disregard of reality is a disservice to those members of the bar who have to use these rules to resolve practical disputes.

¶54. We now have one rule regarding the inherited property of those who have managed their income responsibly, and another for those who this Court considers "extravagant."

¶55. I also disagree with the majority's conclusion that the District Court made adequate findings to award any interest in the farm land to Kathy in lieu of maintenance. Section 40-4-203(2)(f), MCA, requires that before maintenance is ordered the district court must consider "the ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance."

¶56. In this case, the court ordered Ronald to pay Kathy $45,000, based not on any

appreciated value in the Nebraska farm land, but based on the court's determination of the full value of his interest. However, there is no evidence that he has $45,000 to give to Kathy. The majority's solution is to casually suggest that he can mortgage his interest in the Nebraska farm, or pay her $545.98 a month. As noted previously, there is absolutely no basis in the record, nor common experience, for concluding that someone could obtain a mortgage for $45,000 on a future interest in property which is subject to divestment if the interest holder does not survive the person who currently has a life estate in the property. Neither was there any basis in the record for concluding that Ronald had $545.98 a month with which to pay the $45,000 over the next ten years.

¶57. Finally, I disagree with the majority's conclusion that the District Court correctly valued Ronald's interest in the Nebraska farm.

¶58. Kathy's expert arrived at a value for Ronald's future interest in the amount of $149,874. However, his appraisal did not take into consideration the fact that five of the 300 acres had been transferred to Ronald's mother, and that the five acres included the family residence, outbuildings, and a well which, in Ronald's opinion, equaled 25% of the total value of the property.

¶59. The District Court concluded, and the majority agreed, that there was no documentation that the property had, in fact, been transferred to Ronald's mother. However, no documentation was necessary. Both parties agreed that the property had been transferred. In fact, Kathy gave the following testimony at trial:

Q. Do you recall your husband and sister [sic] transferring to their mother the farmstead during your marriage?

A. Yes, I do.

Q. Okay. That was something that Ron and his sisters inherited, correct?

A. ----

No

Q. And then they deeded it back to their mother?

A. I believe that's true.

Q. Okay. The number that you gave to Mr. Rogge, and the number that he has used to evaluate the Nebraska property, is the gross value of all the property received at the time of the inheritance, true?

A. True.

Q. So the number that you gave to Mr. Rogge does not take into account the value of the transfer of the farmstead back to Mrs. Foreman, Ron's mother, correct?

A. It may not, house and the acres and some things like that, it may not.

Q. So Mr. Rogge's evaluation is incorrect?

A. It does not take that into consideration.

Q. And if that portion of the property has substantial value, then Mr. Rogge is substantially incorrect, true?

A. True. If that's the way you want to put it, yes.

¶60. In light of these stipulated facts, the District Court and the majority have raised the bar for proof of a simple fact to a new and unnecessary level.

¶61. The majority affirms the District Court's finding that no credible evidence was offered to support Ronald's testimony regarding the value of that part of the property which was transferred back to his mother. However, Ronald's testimony was uncontroverted. Kathy retained an expert appraiser who should have been in a position to dispute Ronald's testimony if there was any basis for doing so. However, he did not. Therefore, the District Court abused its discretion when it disregarded both the uncontradicted testimony that the property had been transferred, and the uncontradicted testimony regarding the transferred property's value.

¶62. In its haste to affirm the District Court's valuation of Ronald's interest in the Nebraska farm, the majority simply adopts the District Court's reasoning without any evidentiary basis for doing so. I disagree.

¶63. The majority's disposition of this case is based on the fiction that a nonpossessory future interest in real estate which is subject to divestment can somehow be maintained or preserved by the homemaking efforts of the nonacquiring spouse. The majority's conclusion to that effect makes no sense, returns treatment of preacquired, gifted, or inherited property to the case-by-case result-oriented approach that we tried to depart from in *Engen* less than a year ago, and makes the job of advising clients in dissolution cases where that kind of property is at issue impossible. The majority opinion will certainly give rise to many creative arguments by nonacquiring spouses when it comes to claims against preacquired, gifted, or inherited property. However, it does nothing to give guidance to practitioners, district courts, or parties so that they can divide property without the necessity of litigation in every case.

¶64. What this case also means is that no parent can give or devise property to a son or daughter, secure in the knowledge that that property will be used to provide for their offspring's well-being without becoming the subject of claims by their offspring's spouse in the event of an unsuccessful marriage. The right to provide for the members of a person's family is an important right which our statutory and case law have previously recognized. That right is greatly diminished, if it exists at all anymore, by the majority's opinion in this case.

No

¶65. For these reasons, I dissent from the majority opinion. I would reverse the District Court's inclusion of Ronald's future interest in the Nebraska farm land in the marital estate and remand this case to the District Court for division of the parties' property without regard to the Nebraska farm land, and for reconsideration of Kathy's right to maintenance based on all those factors which must be considered by statute.

/S/ TERRY N. TRIEWEILER

1. [1]In a post-trial hearing, Ronald testified that his annual salary has now increased to $60,000.

2. [2]The District Court directed that Ronald make payment of the $45,000 as a lump sum within 90 days of the date of the court's decree, or arrange for payment of the sum in equal monthly installments amortized over a 10-year period with an interest rate of 8% per annum.