No. 04-619

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 63

IN RE THE MARRIAGE OF ELIZABETH C. HARRIS,

        Petitioner and Respondent,

  and

JAMES L. HARRIS,

        Respondent and Appellant.

APPEAL FROM:    The District Court of the Eleventh Judicial District,
                In and For the County of Flathead, Cause No. DR 2002-287A,
                Honorable Ted O. Lympus, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                William L. Managhan, Managhan Law Office, Kalispell, Montana

        For Respondent:

                Stephen C. Berg, Johnson Berg McEvoy & Bostock, Kalispell, Montana

Submitted on Briefs:  September 28, 2005

Decided:  April 4, 2006

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1     After twenty-four years of marriage, Elizabeth ("Liz") and James ("Jim") Harris divorced. Their two grown daughters no longer lived with them at the time of dissolution but their youngest daughter, still in high school, divided her time equally between her parents' homes. The only issues before the District Court involved the division of the parties' assets and whether Liz should be awarded maintenance, and if so, how much. The Eleventh Judicial District Court awarded Liz the majority of the couple's assets, imposed on Jim the majority of the couple's non-mortgage debt, and required Jim to pay a cash equalization payment to Liz of $359,821.00, as well as $750.00 per month as maintenance for five years. We reverse the District Court's division of the marital estate, and remand for further proceedings .

## ISSUES

¶2     The issues on appeal are:

¶3     Was the District Court's division of the marital estate equitable and supported by substantial evidence?

¶4     Was the District Court's award of maintenance equitable and supported by substantial evidence?

## FACTUAL AND PROCEDURAL BACKGROUND

¶5     During the couple's twenty-four year marriage, Jim was consistently employed in automobile sales and sales management positions. Liz worked at various jobs in the early and latter years of the marriage but for approximately twelve years in the middle of the

2

marriage, she remained at home raising the couple's three daughters and doing volunteer work. The Harris family lived comfortably and well beyond Jim's and Liz's combined incomes primarily through gifts from their families. The record shows that Jim's and Liz's parents gave Jim and Liz, over the course of the marriage, gifts and cash valued at just under $1,500,000.00. The District Court found that approximately ninety-five percent of these gifts came from Jim's family.

¶6 Despite their financial means, the couple's debt at the time of dissolution was over $100,000.00. In addition, there was a $420,000.00 mortgage balance remaining on the marital home. During the marriage, the couple did not make any retirement financial plans or arrangements. For a short period of time, Jim participated in a retirement plan with an employer, but cashed it out and used the funds to pay marital debt.

¶7 Beginning in 1978 when the couple married, Jim's parents paid for their honeymoon, bought them a home and a car and gave them cash for furnishings. Subsequently, in 1986, Jim began receiving approximately $1,000.00 per month from his parents as well as cash gifts at Christmas and on birthdays. Some years, the Christmas gift was $5,000.00, and other years it was $2,500.00.

¶8 In 1982, Jim's father, Walter, established an insurance trust fund naming, Jim, among others, as a beneficiary. In 1989, Walter established the Walter L. Harris Trust Fund (the Trust). In 1993, Jim's parents began sending him $2,000.00 per month. In January 2002, Jim's mother increased the monthly gift to $4,500.00, indicating that $2,500.00 of this amount was intended to be used for the benefit of her granddaughters.

3

¶9     When Walter died in 1996, Jim received a $200,000.00 lump sum insurance benefit payment from the insurance trust. Jim's mother, Ruth, who was seventy-nine at the time, began receiving a monthly income from the Trust. She will continue to receive monthly payments until her death. As of 2004, the record shows that Ruth was receiving approximately $35,000.00 per month from the Trust. This amount consisted of all the interest earnings plus some of the Trust principal. Testimony established that the principal of the Trust in 2004 was between $8,000,000.00 and $9,000,000.00, with annual interest income of between $200,000.00 and $240,000.00. Upon Ruth's death, Jim and his two brothers will become the "income" beneficiaries of the Trust. As such, they will each receive one-third of the annual interest income from the Trust. (In 2004, one-third of the interest income was approximately $67,000.00 to $80,000.00 per year.) Since the Trust is a generation-skipping trust, neither Jim nor his brothers will ever be entitled to any of the Trust principal, except if needed for health care purposes.

¶10    The record also reveals that at some time during the 1990s, Liz purchased a one-fifth interest in eighty acres of Idaho property with her father and her three sisters. Jim signed a quitclaim deed to Liz at the time of purchase. The purchase price was $400,000.00. The property carried a mortgage balance of $200,000.00 at the time of the dissolution hearing. As a result, Liz valued her one-fifth ownership at $40,000.00. Jim testified that the property had appreciated in value and the court should attribute a higher value than $40,000.00. He did not provide any evidence of such appreciation, however. Liz also owned a 12% interest in her parents' family-owned business and had received approximately $9,000.00 income per

year that went directly toward paying the mortgage on the Idaho property. Liz had originally valued her interest in the small company at $97,000.00, but just prior to the dissolution hearing, Liz was notified by her parents that they were buying back all the company shares from their daughters for personal reasons. Accordingly, they sent Liz a $5,000.00 check to reflect the buyout of her interest.

¶11    In its June 2004 Findings of Fact, Conclusions of Law and Decree of Dissolution, the court determined that the couple had made no retirement plans, based in large part on the assumption that Jim's ultimate inheritance would allow them to continue their lifestyle into retirement. The court surmised that because Jim was going to receive lifelong income from his father's Trust that would provide him with income after his retirement, his post-dissolution circumstances would not change. It concluded, however, that Liz's post-dissolution circumstances would change dramatically, and therefore an equalization payment was warranted. The court ordered Jim to make a cash payment to Liz of $359,821.00, representing one-fourth of $1,439,287.00, which was the amount the court concluded had been gifted to Jim and Liz by their parents over the course of the marriage. Additionally, the District Court found that, under the applicable statute, Liz was entitled to spousal maintenance, and awarded her the sum of $750.00 per month for five years.

¶12    The District Court also divided and distributed the couple's assets. It utilized the real property values provided by one, or both, of the parties, and accounted for their debts based on current statements. It attributed a value to the marital home of $600,000.00 and awarded the equity value of approximately $200,000.00 to Liz. However, it made no finding in the

5

original Decree as to which party was to pay off the $400,000.00 mortgage balance. Additionally, the court attributed a $40,000.00 value to Liz's one-fifth interest in the Idaho property and awarded this property interest to her. Lastly, the court awarded Liz the $4,000.00 she had in an employer-sponsored IRA, and ordered that she be responsible for the $10,200.00 balance on her American Express credit card.

¶13 In the "personal property" column for Jim, the District Court placed Jim's one-third life interest income from his father's Trust, assigning a value of $3,000,000.00 to Jim's interest. It also included four vehicles with a total value of $22,500.00. Lastly, it imposed the balance of the couple's non-mortgage debt of approximately $96,000.00 to Jim.

¶14 On July 28, 2004, Jim filed his Notice of Appeal. In September 2004, upon a motion to the District Court, Jim was granted a thirty-day stay of execution of the judgment to allow him time to obtain a supersedeas bond to secure the judgment on appeal. However, after several attempts, he was unable to obtain such a bond. After filing his Brief on appeal, Jim moved the District Court to stay execution of the judgment on appeal without a supersedeas bond, as permitted under Rule 7(b), M.R.App.P. The District Court held a hearing on January 11, 2005, and on May 10, 2005, the court issued its Order instructing Jim that, in lieu of posting a supersedeas bond, he was to surrender his occupancy in the marital home and quitclaim his property interest in the home to Liz. She was instructed to assume responsibility for the mortgage payments thereafter. Neither Jim nor Liz have sought to appeal the District Court's May 2005 ruling on the disposition of the marital home.

¶15 On appeal, Jim challenges the District Court's inclusion of his inheritance in the property division, the court's valuation of the inheritance, the court's valuation of Liz's Idaho property, and the court's award of an equalization payment and maintenance to Liz.

**STANDARD OF REVIEW**

¶16 We review a district court's division of marital property and maintenance award to determine whether the findings of fact upon which the division and the award are based are clearly erroneous. *In re Marriage of Payer*, 2005 MT 89, ¶ 9, 326 Mont. 459, ¶ 9, 110 P.3d 460, ¶ 9. A district court's findings are clearly erroneous if they are not supported by substantial evidence, if the court misapprehended the effect of evidence, or if our review of the record convinces us that the court made a mistake. *Payer*, ¶ 9. Where substantial credible evidence supports the court's findings and judgment, we will affirm a district court's division of property and award of maintenance unless we identify an abuse of discretion. *Payer*, ¶ 9. A district court may award maintenance after marital property has been divided equitably pursuant to § 40-4-202, MCA, and the court properly has applied the criteria of § 40-4-203, MCA. *Payer*, ¶ 9 (internal citations omitted).

¶17 Although the district court may equally divide the marital assets, an even distribution is not mandated by § 40-4-202, MCA. Section 40-4-202, MCA, is flexible and vests a good deal of discretion in the district court. As we have stated previously, each case must be looked at individually, with an eye to its unique circumstances. *In re Marriage of Laster* (1982), 197 Mont. 470, 476, 643 P.2d 597, 601 (citation omitted).

**DISCUSSION**

7

¶18    Jim argues that the District Court's division of the marital estate was inequitable and was not supported by substantial evidence. He specifically challenges the District Court's factual findings that: 1) include his future inheritance in the property division; 2) value that future inheritance at $3,000,000.00; 3) award Liz an equalization payment based on past family gifts; 4) fail to include Liz's former 12% interest in her parents' company in the property division; and 5) value Liz's Idaho property at $40,000.00. We will address each concern individually.

*The inclusion of Jim's inheritance in the District Court's property division*

¶19    Relying on § 40-4-202, MCA, Jim argues that his future inheritance should not be included in the marital estate or the court's property division because Liz did not contribute to its facilitation or maintenance.

¶20    The relevant portion of § 40-4-202, MCA, provides:

> (1) In a proceeding for dissolution of a marriage . . . the court, without regard to marital misconduct, shall . . . finally equitably apportion between the parties the property and assets belonging to either or both, however and whenever acquired and whether the title thereto is in the name of the husband or wife or both. In making apportionment, the court shall consider the duration of the marriage and prior marriage of either party; the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties; custodial provisions; whether the apportionment is in lieu of or in addition to maintenance; and the opportunity of each for future acquisition of capital assets and income. The court shall also consider the contribution or dissipation of value of the respective estates and the contribution of a spouse as a homemaker or to the family unit. In dividing property . . . acquired by gift, bequest, devise, or descent . . . the court shall consider those contributions of the other spouse to the marriage, including:
> (a) the nonmonetary contribution of a homemaker;
> (b) the extent to which such contributions have facilitated the maintenance of

8

this property; and

(c) whether or not the property division serves as an alternative to maintenance arrangements.

¶21 Since the Uniform Marriage and Divorce Act (UMDA) became effective in January 1976, the inheritance and gift provisions of this statute have been applied on numerous occasions and with varying results. In *Morse v. Morse* (1977), 174 Mont. 541, 571 P.2d 1147, we held that the wife's cash inheritance received during the marriage was properly an asset of the marital estate at the time of dissolution. In *In re Marriage of Brown* (1978), 179 Mont. 417, 587 P.2d 361, we determined that the wife had acquired a vested interest in a ranch inherited by her husband during their marriage, as a result of her non-monetary contributions as a mother, homemaker and part-time ranch hand, as necessary.

¶22 In *Balsam v. Balsam* (1979), 180 Mont. 129, 589 P.2d 652, on the other hand, we affirmed the district court's determination that pre-marital trust fund cash and stock was "not . . . the product of any marital effort by either of them, but [was] purely a gift toward which the wife has made no contribution and, therefore, any entitlement in her should take this factor into account." *Balsam*, 180 Mont. at 134, 589 P.2d at 654.

¶23 The *Balsam* decision was subsequently embraced in *In re Marriage of Herron* (1980), 186 Mont. 396, 608 P.2d 97, in which we determined that because nearly all of the property accumulated by the Herrons could be traced to gifts or bequests from the wife's father, an equal distribution constituted an abuse of the district court's discretion. We said: "If none of the value of the property is a product of contribution from the marital effort, the District Court can justifiably find that the non-acquiring spouse has no interest in the property."

9

*Herron*, 186 Mont. at 404, 608 P.2d at 101.  See also *In re Marriage of Smith* (1995), 270 Mont. 263, 891 P.2d 522, wherein we affirmed the district court's conclusion that the husband was not entitled to any of the wife's pre-marital property because he failed to demonstrate that "his actions in any way maintained or increased the value of the corpus of the trust[]." *Smith*, 270 Mont. at 268, 891 P.2d at 525.

¶24    In 1998, this Court decided *In re Marriage of Engen*, 1998 MT 153, 289 Mont. 299, 961 P.2d 738, in which we held that the condominium purchased during the marriage by the husband with funds acquired through the sale of a family home given to him before the marriage should be awarded exclusively to him.  This decision was based on the fact that the couple had lived in the condominium only a short time and there was no evidence that the small increase in the property's value was due to any contribution by the wife to its maintenance.  *Engen*, ¶¶ 34 and 42.  Therefore, the rule of *Engen* can be restated as "while gifted or inherited property acquired during the marriage may be included in the marital estate, if none of the value of the property is a product of contribution from the marital effort, the district court can justifiably find that the non-acquiring spouse has no interest in the property."  See also *Herron*; *In re Marriage of Stewart* (1988), 232 Mont. 40, 45, 757 P.2d 765, 768; *In re Marriage of Luisi* (1988), 232 Mont. 243, 245, 756 P.2d 456, 458.

¶25    Subsequently, in *In re Marriage of Foreman*, 1999 MT 89, 294 Mont. 181, 979 P.2d 193, the Court determined that "[t]he underlying policy of equitable apportionment of marital assets would be thwarted by a wooden application of the rule emphasized in *Marriage of Engen . . . ."  Foreman*, ¶ 25.  In *Foreman*, under his father's will, Ronald Foreman inherited

10

a one-third interest in the remainder of his parents' Nebraska property, subject to a life estate for his mother. While the Foremans never lived on the property, received any income from it, nor made any tax or business contributions to it (*Foreman*, ¶ 9), they did rely on the property as a means to pay off future marital debt; therefore, they lived beyond their own financial means throughout their marriage. *Foreman*, ¶¶ 10 and 22. Ronald's wife, Kathy, testified that she relied on her husband's representations to justify their pursuit of comfortable lifestyles rather than saving for retirement. *Foreman*, ¶ 22. We concluded that Ronald enjoyed a vested remainder interest that could be included in the marital estate. We also held that while Kathy admitted she never directly contributed to the maintenance of the Nebraska property, she, nonetheless, "facilitated the maintenance" of the property by her contributions as a homemaker and by allowing all of her earnings to be consumed in pursuit of their lifestyles. *Foreman*, ¶ 27. We surmised that the property's value was preserved by the total consumption of all earned income, without which the couple "presumably would have had to borrow against the value of Ronald's vested remainder interest . . . ." As a result, we held that Kathy was entitled to an equitable share of the property's preserved value. *Foreman*, ¶¶ 28 and 29. See also *In re Marriage of Davis*, 1999 MT 218, 295 Mont. 546, 986 P.2d 408 (Wife's income was used to support the household and improve the marital home, in addition to her contributions as homemaker and caregiver to husband's mother, all of which entitled her to a substantial and equitable share of the full value of the marital home that husband had owned prior to the marriage.).

¶26 Most recently, in *In re Marriage of Herrera,* 2004 MT 40, 320 Mont. 71, 85 P.3d 781, husband Richard appealed the district court's award of part of his $23,000.00 retirement fund to wife Teresa during dissolution. This Court, returning to the rule emphasized in *Engen*, reversed the district court's award to Teresa on the ground that she had not contributed to the appreciation or preservation of Richard's retirement account. *Herrera*, ¶ 29.

¶27 While no clear rule emerges from these previous decisions, the most analogous cases lead to a conclusion that while Liz contributed substantially to the marital assets and estate by raising the couple's children, general homemaking activities, and contributing all of her earnings to the marital estate, these contributions did not, in any way, facilitate the maintenance or enhance the value of the Trust from which Jim was to inherit future income. In fact, nothing Liz did or failed to do during the marriage had any impact whatsoever on either the value or distribution provisions of the Trust. As a result, we are compelled to conclude that Liz is not entitled to an equitable share of the Trust's preserved or appreciated value and the Trust should not have been included in the marital estate. *Smith*, 270 Mont. at 268, 891 P.2d at 525.

¶28 Notwithstanding that the District Court may not distribute any portion of the Trust's future income to Liz, the District Court may nonetheless consider Jim's future income from the Trust when distributing the existing marital estate. Under § 40-4-202(1), MCA, in equitably apportioning the marital property and assets between the parties, the court shall take into consideration several factors, including, but not limited to, the length of the marriage, the age of the parties, their occupations, their needs, and "the opportunity of each

12

for future acquisition of capital assets and income." See *In re Marriage of Dalley* (1988), 232 Mont. 235, 241, 756 P.2d 1131, 1133. In the case before us, Jim has a vested remainder interest in the Trust; unless he dies before his mother or she depletes the Trust prior to her death, Jim will begin receiving income from the Trust upon her death. Therefore, we conclude that, in dividing the marital estate, upon remand, the District Court may consider Jim's inheritance as providing an opportunity for future acquisition of capital assets.

*District Court's valuation of Jim's future inheritance at $3,000,000.00*

¶29 We also conclude the District Court erroneously valued Jim's Trust inheritance at $3,000,000.00. While the record contained substantial evidence that Jim would receive between $66,000.00 and $80,000.00 annually based on a Trust corpus of approximately $9,000,000.00 in 2004, there was no evidence establishing the present value of Jim's interest in the Trust, nor did the court explain how it reached the $3,000,000.00 valuation. Upon remand, the District Court shall, based upon competent evidence and with the assistance of an expert, if necessary, determine the present value of the income stream from the Trust corpus, as well as the likely stream of annual income Jim will receive in the future, based upon actuarial values. As indicated above, the court may then take this figure into account in recalculating the distribution of marital assets. It may also take this figure into account in considering the amount and duration of maintenance. See ¶ 36 below, and § 40-4-203(2)(f), MCA.

*Equalization payment based on past family gifts*

¶30 The District Court awarded Liz an equalization payment of approximately $360,000.00. The court did so on the supposition that, but for the parties' expectation of Jim's future inheritance, they would have saved for their retirement. The court arrived at the equalization payment figure by taking into account the total value of the gifts and cash given Liz and Jim by their parents (see ¶ 5), and dividing this figure by four. Jim argues this calculation was both erroneous and arbitrary.

¶31 We have to agree with Jim, for the simple reason that the marital estate does not contain any cash for distribution to Liz, much less the sum of $360,000.00. Recently, in *In re the Marriage of Dennison,* 2006 MT 56, ¶ 22, ___ Mont. ___, ¶ 22, ___ P.3d ___, ¶ 22, we reversed a similar equalization payment, concluding that the District Court exceeded its authority under § 40-4-202, MCA, when it awarded property in excess of the proven net worth of the estate. The same result is compelled here. When a court makes a present award of cash or property that does not exist in the marital estate, it abuses its discretion. Thus, we must order the court to vacate the equalization payment. Upon remand, the court should take this factor into account in re-determining the division of the marital estate and the matter of maintenance. See ¶ 36.

*District Court's failure to include Liz's former 12% interest in her parents' company in the property division*

¶32 Jim complains that Liz sold her 12% interest in her parents' family-owned business back to her parents shortly before the trial. He maintains that this corporate interest was a marital asset and the sale was in violation of § 40-4-121(3)(a), MCA, which prohibits parties

in a dissolution proceeding from selling property without the permission of the other party or the court. Jim argues that the District Court erred by not making a specific finding on this issue. However, the record reveals there was substantial credible evidence presented to the District Court to warrant exclusion of Liz's gifted interest in the company from the marital estate. Moreover, given that she no longer possessed this interest and provided a reasonable explanation for the sale, we conclude the District Court did not err in failing to include this $5,000.00 in the marital property or in failing to render a specific factual finding on this issue. As a general rule, a district court is not required to make a specific finding as to each item of evidence presented, especially undisputed evidence. Rather, the court need only make specific findings of the essential and determining factors upon which its conclusions rest. See *Moseman v. Moseman* (1992), 253 Mont. 28, 31, 830 P.2d 1304, 1306.

*District Court's valuation of Liz's Idaho property at $40,000.00*

¶33 Jim challenges the District Court's valuation of Liz's share of the Idaho property she co-owns with her father and her sisters. Liz testified that after the original purchase, her father acquired, through a property trade, the Idaho property share held by one of her sisters. This resulted in confusion about whether there were now four co-owners, or five. The District Court determined that Liz held a one-fifth share interest in the property. The District Court therefore divided the $200,000.00 equity in the property by five which resulted in a $40,000.00 equity share to Liz. While Jim testified that he believed the property had appreciated in value and such an appreciated value should be used to determine the value of Liz's share, he produced no evidence of this appreciated value at trial. *Foreman*, ¶ 37. We

15

therefore assign no error to the court's evaluation. A district court may value marital property based on expert testimony, lay testimony, documentary evidence, or any combination thereof, as long as the valuation is reasonable in light of the evidence submitted. *In re Marriage of Crilly*, 2005 MT 311, ¶ 19, 329 Mont. 479, ¶ 19, 124 P.3d 1151, ¶ 19.

*District Court's award of maintenance to Liz*

¶34 Lastly, Jim maintains that the District Court's award of maintenance was inequitable and was not supported by substantial evidence. As noted above, the District Court awarded $750.00 in monthly maintenance to Liz for a period of five years. Section 40-4-203, MCA, defines the circumstances under which a court may award maintenance following a dissolution proceeding. It provides in relevant part:

> (1) In a proceeding for dissolution of marriage . . ., the court may grant a maintenance order for either spouse only if it finds that the spouse seeking maintenance:
> (a) lacks sufficient property to provide for his reasonable needs; and
> (b) is unable to support himself through appropriate employment . . . .
> (2) The maintenance order shall be in such amounts and for such periods of time as the court deems just, without regard to marital misconduct, and after considering all relevant facts including:
> (a) the financial resources of the party seeking maintenance, including marital property apportioned to him, and his ability to meet his needs independently . . . ;
> (b) . . . ;
> (c) the standard of living established during the marriage;
> (d) the duration of the marriage;
> (e) the age and the physical and emotional condition of the spouse seeking maintenance; and
> (f) the ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance.

¶35 We conclude that while Liz presently enjoys a salary comparable to Jim's salary, Jim's future annual income will be substantially greater than Liz's; therefore, Jim will

16

continue to enjoy the standard of living the couple established during the marriage. Additionally, while Liz was awarded the marital home in lieu of Jim's supersedeas bond, the home, with its substantial remaining mortgage, is currently an income-consuming asset. As we stated in *Herron*, 186 Mont. at 408, 608 P.2d at 103, "[t]he danger exists of creating a situation in which Mrs. Herron would be 'property poor', i.e., in possession of a large quantity of property but unable to generate the income to maintain the property."

¶36 Based on the duration of the marriage, the standard of living established during the marriage, the inability of Liz to now sustain that standard of living, the ability of Jim to continue to do so, and the current disparity between the debts owed by each ($96,000 for Jim and $410,000.00 for Liz), we conclude it was not error for the District Court to award maintenance to Liz. However, as we have frequently stated, §§ 40-4-202 and -203, MCA, covering distribution of property and maintenance, respectively, "must be considered together." *In re Marriage of Rolf*, 2003 MT 194, ¶¶ 25-26, 316 Mont. 517, ¶¶ 25-26, 75 P.3d 770, ¶¶ 25-26 (citation omitted). Because we are remanding for a re-distribution of marital assets and with instructions to vacate the equalization payment, we remand, as well, for a reconsideration of the appropriate amount of maintenance.

## CONCLUSION

¶37 For the foregoing reasons, we reverse the District Court's division of the marital estate and remand for further proceedings in accordance with this Opinion.

/S/ PATRICIA COTTER

17

We Concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ W. WILLIAM LEAPHART
/S/ JIM RICE