No. 97-442

IN THE SUPREME COURT OF THE STATE OF MONTANA

1998 MT 153

IN RE MARRIAGE OF

JON ENGEN,

Petitioner and Appellant,

and

DIANA LYNN BROGGER ENGEN,

Respondent, Respondent, and Cross-Appellant.

APPEAL FROM: District Court of the Eighteenth Judicial District,

In and for the County of Gallatin,

The Honorable Thomas A. Olson, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Rienne M. McElyea; Berg, Lilly, Andriolo & Tollefsen, P.C.;

Bozeman, Montana

For Respondent:

Kent M. Kasting; Kasting, Combs & Kauffman;

Bozeman, Montana

Submitted on Briefs: April 2, 1998

Decided: June 18, 1998

Filed:

_____

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

**¶1 The petitioner, Jon Engen, filed a petition for dissolution of his marriage to the respondent, Diana Engen, in the District Court for the Eighteenth Judicial District in Gallatin County. Following a nonjury trial, the District Court divided the couple's property by a decree of dissolution based on its findings of fact and conclusions of law. Jon appeals from the District Court's property distribution. We affirm in part and reverse in part the judgment of the District Court, and remand this case to the District Court for entry of judgment consistent with this opinion.**

**¶2 Jon presents three issues on appeal:**

**¶3 1. Did the District Court err when it awarded Diana one-half the value of the condominium which was purchased during the marriage with proceeds from the sale of a home in Norway which was given to Jon before the couple's marriage?**

¶4 2. Did the District Court err when it awarded Diana one-half of a set of Norwegian dishes which were acquired before and during the marriage?

¶5 3. Did the District Court err when it declined to enforce a premarital property agreement which had been executed by Jon and Diana?

## FACTUAL BACKGROUND

¶6 Jon Engen and Diana Lynn Brogger met in the early 1980s while they attended Montana State University in Bozeman. After their graduation in 1983, they moved to Norway, where Jon was born and raised, with the expectation that they would marry and possibly live there.

¶7 Jon's Norwegian grandfather built a home in Norway in 1930 and lived there until shortly before his death in the mid-1980s. Jon's mother inherited an interest in the home and used her savings to purchase the remaining interests in the home from the remaining heirs. She then gave the home to Jon.

¶8 While Jon and Diana were in Norway, Jon had an agreement prepared, in the Norwegian language, which provided that the home was Jon's separate property. Diana signed the agreement on March 2, 1984, and it was filed with the court where the property was located.

¶9 Diana contends that at the time the agreement was executed, her understanding of the Norwegian language was elementary and that she did not understand the effect of the document she had executed. Jon testified that he interpreted the agreement to Diana, line-by-line, and that she indicated her understanding of the document's effect before she signed it.

¶10 Jon and Diana moved back to Montana in May 1984 and were married in August 1984 in Polson, near Diana's home. They then returned to Bozeman to live.

¶11 Jon owned the home in Norway from the time that it was given to him until it was sold in 1994. During that time, no marital income was invested in the home. Maintenance of the home and taxes were paid for by the rent that the home generated. Jon's father, who continued to reside in Norway, took care of the home when it was necessary to do so.

¶12 Jon's degree was in engineering and he worked at various jobs as an engineer following the couple's marriage. Diana had a degree in geographical planning, and also worked at a variety of jobs. In 1989, Diana returned to MSU to take courses which would enable her to pass the examination for certified public accountants. During the following three years that she attended school, she worked part-time.

¶13 Jon's work was also interrupted periodically during the marriage by training for the U.S. Olympic Nordic Ski Team for which he competed in 1988, 1992, and 1994. However, from 1988 until the couple's separation in 1995, Jon was the primary income producer for the household.

¶14 In 1994, Jon's home in Norway was sold for approximately $100,000. The proceeds were deposited in a bank account in Norway in Jon's name. The title to the home had also been held in Jon's name alone.

¶15 Jon and Diana acquired very little property during their marriage. Most of the District Court's property division is uncontested. The primary asset that was purchased was a condominium located in Bozeman. The condominium was purchased in November 1994 for $112,500. At the time of trial, the value had appreciated to $115,000. The deed indicated that Jon and Diana held the condominium as joint tenants. However, the primary source of funds for the purchase was the money received from the sale of Jon's home in Norway. Jon had $92,450 transferred from his account in Norway to joint accounts held by the couple in Ronan and Bozeman, where $82,669.69 of that amount was combined with a $30,000 loan from Jon's parents to make the purchase. The promissory note to Jon's parents is dated November 30, 1994.

¶16 Jon and Diana lived together in the condominium from November 1994 until their separation on July 1, 1995. Jon filed a petition for dissolution on July 19, 1995. The District Court entered a temporary order in September 1995, which allowed Diana to live in the condominium, where she remained until September 1996.

¶17 Jon testified that when he purchased the condominium, he had no intention of relinquishing his sole ownership of the proceeds from the sale of the house he had been given in Norway, and that he and Diana had no conversation about joint ownership of the condominium. He testified that the documents indicating joint ownership were just part of the paperwork that was executed at the time of the real

estate closing without any real forethought.

¶18 Diana agreed that she was not on the title to the property in Norway and that she had never contributed, either financially or otherwise, to its maintenance or appreciation. She agreed that the purchase of the condominium was made with the proceeds from the sale of the Norway home, but testified that it was her understanding that she and Jon would own the condominium together.

¶19 During the six to seven months that the couple occupied the condominium during their marriage, Diana testified that she "kept it up," but acknowledged that she had not invested money in its maintenance, nor made any other improvements, other than to hang some drapes. Any increase in the value of the condominium seems to have resulted from a general increase in the value of real property in the area, rather than improvements made by either Jon or Diana.

¶20 At the time of trial, Jon and Diana had annual incomes of $18,000 and $19,000, respectively.

¶21 The District Court found that Jon owned the home in Norway prior to the marriage and that he transferred the proceeds from its sale in 1994 to the couple's joint bank accounts in Montana. The District Court concluded as a matter of law that Jon's "transfer of [his] premarital funds to the parties' joint account and the subsequent purchase of the condominium in [their] joint names . . . constituted a gift of one half interest in [the condominium] from [Jon] to [Diana]." It held that Jon was precluded from claiming the condominium was not part of the marital estate by the fact that he commingled his separate funds with the couple's joint funds. It awarded Jon the condominium, but ordered him to pay Diana $42,500, or one-half of the couple's equity in the condominium.

¶22 In addition, the District Court declined to reach the issue of whether the premarital agreement was binding. It based its conclusion on its finding that Jon permitted his separate property to be commingled and, therefore, that the parties' premarital intentions were irrelevant.

¶23 Finally, the District Court concluded that the couple should "equally divide the 8-12 place settings of Norwegian porcelain dishes" which it found "were received for the most part as wedding gifts to both parties."

¶24 On May 1, 1997, the District Court entered its decree of dissolution.

ISSUE 1

¶25 Did the District Court err when it awarded Diana one-half the value of the condominium which was purchased during the marriage with proceeds from the sale of a home in Norway which was given to Jon before the couple's marriage?

¶26 We review a district court's division of marital property to determine whether the findings on which it relied are clearly erroneous. *See In re Marriage of Stufft* (1996), 276 Mont. 454, 459, 916 P.2d 767, 770. If the findings are not clearly erroneous, we will affirm the distribution of property unless the district court abused its discretion. *See Stufft*, 276 Mont. at 459, 916 P.2d at 770; *In re Marriage of Hogstad* (1996), 275 Mont. 489, 496, 914 P.2d 584, 588; *In re Marriage of Smith* (1995), 270 Mont. 263, 267-68, 891 P.2d 522, 525. In a marriage dissolution proceeding, the test for an abuse of discretion is whether the district court acted arbitrarily without employment of conscientious judgment or exceeded the bounds of reason resulting in substantial injustice. *See In re Marriage of Meeks* (1996), 276 Mont. 237, 242, 915 P.2d 831, 834.

¶27 Without citing to authority, the District Court concluded that because Jon's separate money, which was received in exchange for preacquired, gifted property, passed through a joint account to purchase a condominium that was jointly titled, Jon gifted one-half of his separate property to Diana. Diana contends that this result finds support in our prior decision in *Bloom v. Bloom* (1968), 150 Mont. 511, 437 P.2d 1. However, *Bloom* was decided in 1968, and Montana's version of the Uniform Marriage and Divorce Act, which applies to this case, became effective on January 1, 1976. In our decisions since that date, we have uniformly held that the manner in which title is held does not control the disposition of preacquired, gifted, or inherited property, or the proceeds from such property. *See In re Marriage of Fitzmorris* (1987), 229 Mont. 96, 745 P.2d 353; *In re Marriage of Snyder* (1986), 220 Mont. 262, 714 P.2d 556; *Morse v. Morse* (1977), 174 Mont. 541, 571 P.2d 1147.

¶28 Section 40-4-202, MCA, now sets forth the guidelines for distribution of property as part of a marriage dissolution and provides in relevant part as follows:

(1) In a proceeding for dissolution of a marriage . . . the court, without regard to marital

misconduct, shall . . . finally equitably apportion between the parties the property and assets belonging to either or both, however and whenever acquired and <u>whether the title thereto is in the name of the husband or wife or both</u>. . . . In dividing property acquired prior to the marriage; property acquired by gift, bequest, devise, or descent; property acquired in exchange for property acquired before the marriage or in exchange for property acquired by gift, bequest, devise, or descent; the increased value of property acquired prior to marriage; and property acquired by a spouse after a decree of legal separation, the court shall consider those contributions of the other spouse to the marriage, including:

(a) the nonmonetary contribution of a homemaker;

(b) the extent to which such contributions have facilitated the maintenance of this property; and

(c) whether or not the property division serves as an alternative to maintenance arrangements.

(Emphasis added.)

**¶29 Section 40-4-202, MCA, provides for equitable distribution of property regardless of the formal manner in which title to the property is held and specifies that in order to be equitable, the distribution of preacquired, gifted, or inherited property, or its proceeds, must take into consideration the nonacquiring spouse's contributions to the property's maintenance. We have previously construed this provision to mean that regardless of who holds title, preacquired or gifted property need not be included in the marital estate unless the nonacquiring spouse contributed to its preservation or appreciation. In that event, we have held that the nonacquiring spouse is entitled to an equitable share of the appreciated or preserved value which is attributable to his or her efforts.** *See Smith***, 270 Mont. 263, 891 P.2d 522;** *In re Marriage of Bradshaw* **(1995), 270 Mont. 222, 891 P.2d 506;** *In re Marriage of Smith* **(1994), 264 Mont. 306, 871 P.2d 884;** *In re Marriage of Rock* **(1993), 257 Mont. 476, 850 P.2d 296;** *In re Marriage of Keedy* **(1991), 249 Mont. 47, 813 P.2d 442;** *In re Marriage of Gallagher* **(1991), 248 Mont. 100, 809 P.2d 579;** *In re Marriage of Luisi* **(1988), 232 Mont. 243, 756 P.2d 456;** *In re Marriage of Fitzmorris* **(1987), 229 Mont. 96, 745 P.2d 353;** *In re Marriage of Herron* **(1980), 186 Mont. 396, 608 P.2d 97.**

¶30 In several cases, we have specifically dealt with arguments that the form of the title by which property was held conferred a distributive interest in that property on a nonacquiring spouse. However, we found those arguments unpersuasive. For example, in *Morse* we held that the fact that a wife had quit-claimed property to her husband prior to the dissolution was not determinative of how that property should be distributed pursuant to what is now § 40-4-202, MCA. *See Morse*, 174 Mont. at 544-45, 571 P.2d at 1149.

¶31 In *Snyder*, the husband had an interest in a family farm and a home before the marriage. He exchanged his interest in the family farm for a note made payable to his wife and him as tenants in common and he invested the proceeds from the sale of his home in another home in which the title was held jointly with his wife. The district court distributed the note and the majority of the equity in the couple's home to the husband. The wife contended that the note should have been included in the marital estate because it was owned by them in common and that based on the manner in which the home was titled, the husband had gifted her a one-half interest in the home. However, referring to § 40-4-202, MCA, we held that:

The question of title is not controlling under this statute. *Morse v. Morse* (1977), 174 Mont. 541, 545, 571 P.2d 1147, 1149. In *Morse*, we upheld a property division in which the District Court did not give controlling weight to the fact that the wife quitclaimed certain property to the husband during the marriage. In a similar manner, we conclude that the District Court here was not required to give controlling weight to the tenancy in common form of ownership in its distribution of the promissory note.

. . . .

 . . . She claims that the husband gifted her with a one-half interest in the marital home, and argues that the fact that the home is owned jointly by the parties is evidence of the gift. She contends that she should therefore be awarded one-half of the home's value.

As we have pointed out, Montana's statutory scheme for disposition of marital property does not give controlling importance to the way in which title to the property is held. Rather, the district court is to make an equitable division of the property, considering the factors set out in § 40-4-202, MCA.

*Snyder*, 220 Mont. at 264-66, 714 P.2d at 557-58.

¶32 Likewise, in *Fitzmorris*, the major assets acquired by the parties during the marriage were held in joint tenancy. However, because the purchase of these assets was financed by stock owned separately by the wife prior to marriage, they were not divided equally by the court. On appeal, the husband contended that the conversion of his wife's separately owned stock to property held in joint tenancy constituted an irrevocable gift to him and, on that basis, that the property purchased should have been divided equally. However, we held:

Even before the passage of the Uniform Marriage and Divorce Act, Montana recognized the rule that title does not control the distribution of marital assets. See Morse v. Morse (1977), 174 Mont. 541, 545, 571 P.2d 1147, 1149. Presently, § 40-4-202, MCA, embodies the same rule by mandating that the court divide assets equitably "whether the title thereto is in the name of the husband or wife or both." Thus, the lower court properly refused to base its decision on the fact that the parties held the property as joint tenants.

*Fitzmorris,* 229 Mont. at 99, 745 P.2d at 355.

¶33 We held in Fitzmorris that as opposed to title, the proper factors for the court to consider in its distribution of that couple's assets were the source of the assets and the parties' contributions to those assets during the marriage.

¶34 Based on our prior decisions in Morse, Snyder, and Fitzmorris, we conclude that the District Court erred when it based distribution of the condominium solely on the form in which title was held, rather than on a consideration of the source of the funds with which the condominium was purchased and the parties' contributions to the maintenance of the condominium after it was purchased. We conclude that when those factors are properly taken into consideration, as they must be pursuant to § 40-4-202, MCA, the condominium is Jon's separate property; that nothing done by Diana during the short period of time that the couple owned the condominium during the marriage contributed to its appreciation; and that the condominium should therefore have been distributed to Jon.

¶35 This conclusion necessarily follows from the prior cases in which we have applied § 40-4-202, MCA, to preacquired, gifted, or inherited property.

¶36 For example, in Herron we held that the district court erred when it divided property owned by that couple equally when, in fact, the sources for most of the

property were gifts from Mrs. Herron's father. Even though that property had been given to the Herrons jointly, we concluded that because Mrs. Herron's father had done so to provide for his daughter, "[t]he property should be considered as principally gifts to Mrs. Herron." Herron, 186 Mont. at 402, 608 P.2d at 100. We then held that:

If none of the value of the property is a product of contribution from the marital effort, the District Court can justifiably find that the non-acquiring spouse has no interest in the property.

. . . .

 . . . Both parties here should share equally in the portion of the value of the gift property attributable to contribution from the marriage and appreciation during the marriage. The Herrons should not, however, share equally in the total value of the property since the marital assets came to the marriage principally as gifts for Mrs. Herron's benefit.

*Herron*, 186 Mont. at 404-05, 608 P.2d at 101-02.

**¶37 Herron is the seminal case interpreting § 40-4-202, MCA, as it relates to preacquired, gifted, or inherited property. However, we have applied the general principle established in Herron, with some refinement, on numerous occasions.**

**¶38 In Fitzmorris, we relied on Herron to conclude that the husband had no interest in stock acquired by his wife prior to marriage when the stock, in fact, declined in value during the marriage. We held that obviously none of the value was due to his contributions. See Fitzmorris, 229 Mont. at 99, 745 P.2d at 354. In Luisi, we held that because the nonacquiring spouse had not contributed significantly to the maintenance of his wife's inheritance during the marriage, the district court was justified when it excluded her inheritance from the marital estate. See Luisi, 232 Mont. at 245, 756 P.2d at 458. We treated preacquired property the same in Gallagher, 248 Mont. at 103, 809 P.2d at 581. In Keedy, where the issue was whether a nonacquiring spouse had an interest in baseball cards collected by her husband both before and during the couple's marriage, we held that:**

In considering the factors presented in § 40-4-202(1), MCA, it becomes apparent that the value of the premarital cards is not properly a part of the marital estate. . . .

However, the appreciation in value of the cards, including the premarital cards, properly could be included in the marital estate under § 40-4-202(1), MCA, if the evidence supported spousal contribution to that appreciated value.

*Keedy*, 249 Mont. at 50, 813 P.2d at 444.

**¶38 In Bradshaw, based on facts similar to those in this case, we held that a nonacquiring spouse had no interest in a preacquired home. We stated:**

In the instant case, the court specifically found that Daniel purchased the home with his own funds before the couple married and he paid for all mortgage and insurance payments as well as taxes associated with the home. Michelle did not make any substantial contributions to the home monetarily or as a homemaker. The court also found that the increase in the value of the house was entirely due to the general inflation of home values in the Missoula area. Under subsection (a) and (b) of § 40-4-202, MCA, Michelle would not be entitled to any portion of the equity in the house because she made no contributions to the maintenance and value of the property.

. . . .

Considering § 40-4-202, MCA, and our case law interpreting that statute, we determine that the District Court should have properly concluded that Michelle was not entitled to any share of the equity in the house. We hold that the District Court erred in awarding a share of the equity in the house to Michelle and accordingly, we reverse on this issue.

*Bradshaw*, 270 Mont. at 230, 891 P.2d at 511.

**¶39 In Smith, we very clearly held that "[t]he court cannot distribute to the non-acquiring spouse property acquired prior to the marriage or acquired by gift, bequest, devise, or descent when there is no evidence that the spouse made any contribution to those assets in any form." *Smith*, 264 Mont. at 312, 871 P.2d at 888.**

**¶40 Whether we have included preacquired, gifted, or inherited property in the marital estate and held that it must be distributed to the spouse to whom it was given or by whom it was preacquired (e.g., *Herron*), or simply held that it is not part of the marital estate (e.g., *Luisi* and *Keedy*), we have consistently treated it differently than property acquired during a marriage through the joint efforts of the couple.**

¶41 In this case, the condominium, which was purchased by Jon and occupied by Jon and Diana during their marriage, was acquired in exchange for property acquired by gift before the marriage, and there is no evidence that the small amount by which it appreciated was due to any contribution by Diana to its maintenance. Nor is there any evidence that the fifty percent share of the equity in the condominium which was distributed to Diana was distributed to her in lieu of maintenance. We therefore conclude that the District Court abused its discretion when it ordered that Jon pay to Diana $42,500 which represented one-half of the equity in the Bozeman condominium. We reverse that part of the District Court's decree and direct that on remand Jon should be awarded the full value of the condominium.

## ISSUE 2

¶42 Did the District Court err when it awarded Diana one-half of a set of Norwegian dishes which were acquired before and during the marriage?

¶43 Jon contends that the District Court erred when it awarded Diana half of the Norwegian dishes that they accumulated. He contends that he owned the majority of the dishes prior to their marriage and that the dishes have more sentimental value to him than they do to Diana.

¶44 However, the evidence of how the dishes were acquired is disputed. Although Jon contends that he bought most of the dishes prior to the marriage when he lived in Norway, and that the remainder were wedding gifts or gifts from his family, Diana testified that Jon owned only a few pieces prior to their marriage, and that most were either purchased by them together or received by both of them as wedding gifts.

¶45 The District Court is in the best position to resolve conflicting testimony, and we will not substitute our judgment for the District Court's findings when, as in this case, those findings are based, to a large extent, on the credibility of the witnesses. See *In re Marriage of Boyer* (1995), 274 Mont. 282, 288, 908 P.2d 665, 668. We conclude that there was substantial evidence to support the District Court's finding that the dishes "were received for the most part as wedding gifts to both parties," and that the District Court's finding about the acquisition of the dishes was not clearly erroneous.

¶46 We decline to engage in an analysis of "who deserves the dishes more" based on

sentimental attachment, but conclude instead that no abuse of discretion has been shown based on the District Court's equal division of the Norwegian dishes.

¶47 For these reasons, we affirm that part of the District Court's decree which divided the Norwegian dishes equally.

## ISSUE 3

¶48 Did the District Court err when it declined to enforce a premarital property agreement which had been executed by Jon and Diana?

¶49 Our conclusion that the District Court erred by distributing to Diana one-half of the value of the condominium purchased with the proceeds from Jon's preacquired property makes it unnecessary to decide this issue. Therefore, we decline to address it.

¶50 Finally, Diana claims a right to attorney fees and costs incurred on appeal. She urges this Court to abandon the current standard which requires a showing that an appeal is "frivolous and unwarranted" and adopt a new standard which would provide attorney fees and costs to the party who prevails on appeal. However, regardless of the standard we apply, Diana would not be entitled to attorney fees because she has not prevailed on the principal issue raised on appeal. Therefore, we decline to consider, at this time, a new standard for the award of attorney fees.

¶51 We affirm in part and reverse in part the judgment of the District Court and remand to the District Court for entry of judgment consistent with this opinion.

/S/ TERRY N. TRIEWEILER

We Concur:

/S/ J. A. TURNAGE

/S/ W. WILLIAM LEAPHART

/S/ JIM REGNIER

/S/ JAMES C. NELSON

No