No. 02-780

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 68

ARDEN COWAN,

            Petitioner and Appellant,

      v.

KATHY COWAN,

            Respondent and Respondent.

APPEAL FROM:    District Court of the Twenty-First Judicial District,
                In and for the County of Ravalli, Cause No. DR-00-122,
                The Honorable John W. Larson, Judge presiding.

COUNSEL OF RECORD:

            For Appellant:

                  Jennifer B. Lint, Boatwright Law Office, P.C., Hamilton, Montana

            For Respondent:

                  Evonne Smith Wells, Attorney at Law, Missoula, Montana

                              Submitted on Briefs:  October 9, 2003

                              Decided:  March 23, 2004

Filed:

            _____
                              Clerk

Justice John Warner delivered the Opinion of the Court.

¶1 Appellant appeals from the Amended Findings of Fact, Conclusions of Law, and Decree of Dissolution entered in the Twenty-First Judicial District Court, Ravalli County, which ordered the sale of a parcel of property, and apportioned part of the proceeds to Respondent. Appellant contends that Respondent held the property in trust for his benefit and thus, she should not have been awarded any of the proceeds from its sale.

¶2 Five issues were raised on appeal. However, we hold the Appellant's claim to the property in question barred by judicial estoppel, therefore, we need not reach the remaining issues.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 Arden Cowan (Arden) is the son of Elmer and Pauline Cowan. Arden has been married three times. He was first married to, and had children with, Joyce Cowan (Joyce). After he and Joyce divorced, Arden married Karen Cowan (Karen). After he and Karen divorced, Arden married Kathy Couchois Cowan (Kathy) on November 24, 1989. Arden and Kathy separated on May 7, 2000, and on August 9, 2002, an Amended Decree of Dissolution was entered, dissolving Arden and Kathy's marriage. In the dissolution action, the District Court determined that Kathy owned a tract of approximately 170 acres, dubbed the Stevensville/Bell Crossing property by the parties. Approximately eleven of these acres were purchased by Arden and Joyce in 1979, and approximately 110 of these acres were purchased by Arden and Karen in the early to mid-eighties. Title to the property, however, was never placed in Arden's name. Legal title was always held by either Arden's parents, or one of Arden's wives. At the outset of the marriage to Kathy, the property consisted of

2

a 110-acre tract and an 11.14-acre tract. During the marriage, Arden and Kathy invested in additional acreage, and at the time of the dissolution, the entire 170 acres was subject to an agreement for sale with third-party buyers. The property was sold shortly after the Decree of Dissolution was entered, and the proceeds of the property were apportioned to Kathy and Arden as set forth in the decree.

## STANDARD OF REVIEW

¶4 We review a district court's division of marital property to determine whether the findings on which it relied are clearly erroneous. If the findings are not clearly erroneous, we will affirm the distribution of property unless the district court abused its discretion. In a marriage dissolution proceeding, the test for an abuse of discretion is whether the district court acted arbitrarily without employment of conscientious judgment or exceeded the bounds of reason resulting in substantial injustice. *Marriage of Engen*, 1998 MT 153, ¶ 26, 289 Mont. 299, ¶ 26, 961 P.2d 738, ¶ 26.

## DISCUSSION

¶5 Arden's foremost argument is that the District Court erred when it found that his parents' transfer of the Stevensville property to Kathy was a gift to Kathy. He argues that his parents' intent in transferring the property was to establish Kathy as trustee of the property for Arden's benefit. There is evidence tending to support Arden's trust theory. However, we agree with the District Court that Arden is judicially estopped from establishing that Kathy held the property in trust and that he is the beneficiary of that trust, because he repeatedly and unequivocally denied that he had any interest in the property whatsoever in a prior lawsuit against him for past due child support.

3

¶6    Arden and his first wife, Joyce, were divorced in 1982. Arden's initial monthly child support payments were $100 per child, and were later increased to $200 per child. Arden attempted to make his support payments, but for health-related reasons, began falling behind. Eventually, the total arrearage reached roughly $18,000.

¶7    In 1993, or early 1994, Joyce filed a suit against Arden for past due support. At trial, in 1994, Arden testified as to his assets. Concerning the Stevensville property, Arden said that he and his second wife, Karen, bought the property in 1987, and placed it in her name. When he and Karen were divorced, Karen owed Arden's parents money and she deeded the property to them in lieu of a cash payment. Arden further testified that when he married Kathy, his parents deeded the property to her. Joyce's attorney questioned Arden about the reasons why Arden's parents deeded the property to Kathy and not to him:

> Q: Now, why would they deed it – this to your wife and not to you?
> A: Well, my medical liabilities are extreme at this point. If you're not familiar with Post-Polio Syndrome, I have got a thing - a medical . . .
> Q: Just answer the question.
> A: Okay. Basically, I'm in a real bad position because of all the medical problems being created by my condition. My parents wouldn't give me anything just because the liabilities of what's going to happen medically are - could be pretty extreme, so they - anything they're doing in disbursing their estate they're giving to Kathy. And Kathy and I have an antenuptial agreement saying all of our stuff is separate, so that she won't suffer the - you know, the legal liabilities if I end up in medical - you know, medical problems here.
> Q: So this transfer, then, was done to basically protect access to and from your medical bills; is that correct?
> A: Well, I can't state - I can't state a state of mind of my parents, they just said we're giving this to Kathy, not to you.
> Q: It's not in your name?
> A: Right. It never has been in my name.
> Q: Do you have any siblings, any sisters, brothers?
> A: I have got two sisters.
> Q: Did your parents likewise deed some property to your two sisters that

4

you're aware of?

A: Yeah, they have.  They try to keep everything pretty much even, so they've been kind of evenly distributing their estate between the three kids - or the two kids and Kathy.  They feel that she's one of their kids.

¶8    Later in the questioning, Joyce's attorney asked Arden why he hadn't considered selling some of his personal property, or made other arrangements, to help make child support payments.  The following dialogue ensued:

Court:  Well, in transferring all this property, why didn't you do something to protect your children?

A: In an awful lot of the property transfers I had - I had little choice in - as far as when Karen and I got divorced, she said I want this, you take that.  And she was the one that ended up doing the paperwork and transferring to my parents.  Through the divorce she was trying to protect me, and the divorce was a direct result of the actions taken by Joyce Cowan.

Q (by attorney): Did you ever tell your parents about your obligation to support your children . . . ?

A: Yeah, I'm sure they were aware of that.

Q: Did you tell them that it might be . . . instead of transferring the property to Kathy, to transfer it . . . to yourself, so you could meet this obligation to these two children?

A: No, Kathy has - Kathy would have the option of doing that if she so desired.

Q: So basically what it comes down to, Mr. Cowan, is you did your best to make sure that these properties were not going to be available for any obligation that you had from any other party, medical, financial, to your children?

A: Yeah, medically I - they're to try to protect me medically.

¶9    Jumping ahead to 2002, and the trial of this case, Arden was again questioned about his assets and the ownership of the Stevensville property.  He testified that beginning in the mid-seventies, he began to have serious concerns about his medical condition, and the large medical bills he might incur.  To insulate his property from the possibility of execution by creditors he began to invest in real estate, but he always placed title to the properties in other peoples' names.  He said that while he recognized that legal title was in someone else, he

5

always believed that he was the true owner of the properties. Specifically regarding the Stevensville property:

> Q: So at about that time, Karen . . . deeded it over to your parents.
> A: Yeah.
> Q: Okay. During the time that Karen held the property, for whose benefit was she holding it?
> A: She was holding it for my benefit.
> Q: And at your request, she transferred it to your folks.
> A: Yes, that's correct.
> Q: Okay. And likewise when your parents held the property, for whose benefit were they holding it?
> A: They were holding it for my benefit . . . .
> Q: Okay. Now, Arden, have you been asked about your ownership of the Bell Crossing property at hearings before?
> A: Yes, I have.
> Q: Okay. And at the time that you testified as to that subject, did you testify that you owned the Bell Crossing property?
> A: The - I didn't testify that I owned it, because it was in another party's name. You know, they were the owner of record. So I testified that they - that they owned it.
> Q: When we first started working on this case a number of months ago and we talked about who owned the property, what was your view?
> A: Well, my view was that I owned the property, but it was in somebody else's name . . . .

Later, when asked about the antenuptial agreement and the extent of his property holdings at the time he and Kathy signed the agreement, Arden testified:

> Q: What did you own on the day you married Kathy when you signed - that day you signed the prenuptial agreement, what did you own?
> A: What I believed I owned on the day I signed the antenuptial agreement is three parcels in Alaska and the two parcels at Bell Crossing, and I believe even though they were in my parents' legal ownership I believed they were holding them for me . . . .
> Q: So it's your testimony today that you owned the Stevensville property, two parcels, and three parcels in Alaska on the day that you married Kathy . . . ?
> A: That - yeah, that's my testimony.
> Q: Okay. Even though your testimony is that 110 acres was never in your name, you're saying here today that you owned that property on the date of your marriage to Kathy.

6

A: Well, I didn't legally own it. What I need to - it's kind of hard to explain. I felt that it was being held for me by another party so I don't know as I can claim that I legally own it. It's just I felt I own it - owned it.

¶10 The doctrine of judicial estoppel binds a party to his judicial declarations, and precludes a party from taking a position inconsistent with previously made declarations in a subsequent proceeding. *Kauffman-Harmon v. Kauffman*, 2001 MT 238, ¶ 15, 307 Mont. 45, ¶ 15, 36 P.3d 408, ¶ 15. A party seeking to utilize the doctrine must show that: 1) the estopped party had knowledge of the facts at the time he took the original position; 2) the estopped party succeeded in maintaining the original position; 3) the position presently taken is inconsistent with the original position; and 4) the original position misled the adverse party, so that allowing the estopped party to change his position would injure the adverse party. *Kauffman*, at ¶ 16.

¶11 The four elements of judicial estoppel are present in this case. First, Arden knew that both legal and equitable title to the property passed from his second wife to his parents to Kathy, allowing him to claim he had no interest in the property. Second, Arden's assertions succeeded in that Joyce was unable to levy execution on the property to satisfy Arden's child support debt to her. Third, after asserting absolutely no interest in the property, Arden now claims that he has had a beneficial interest in the property all along, and that Kathy was merely a trustee. Fourth, Arden's original position, that he had no interest in the property, misled Kathy so that allowing Arden to change his position would injure her. Kathy, having already married Arden when the property was deeded to her, knew that she had legal title to the property and was clearly led to believe that it at least belonged to both her and Arden. The District Court had substantial evidence from which to find that because of Arden's

7

original position in the 1994 lawsuit, Kathy used her separate money to help pay off the debt on the property and for upkeep on the property. Additionally, she spent substantial amounts of money she inherited to buy additional acreage that is included in the parcel that Arden now claims is entirely his. Allowing Arden to reverse his position in this case would substantially alter Kathy's share of the marital distribution after she helped support him and helped add to the value of the property by purchasing additional acreage, which he now contends is solely his.

¶12 A court of equity will not aid one who has caused title to his property to be transferred to another for the purpose of defrauding creditors. *Kauffman*, at ¶ 22. While one may properly protect oneself and one's property through the use of various trust arrangements and estate planning techniques, there is a strong public policy against avoiding one's child support obligations by secret arrangements. The District Court was clearly justified in finding, from Arden's conflicting positions, that at the time of his original testimony he wanted to hide his interest in the property from Joyce. He successfully accomplished that goal. And while he ultimately paid Joyce all he owed her, we will not reverse the District Court's finding that he is to be left where he has placed himself by his purposeful deception. *Nullus commodum capere potest de injuria sua propria.*[1] Section 1-3-208, MCA. *See also* 1 Sir Edward Coke, *A Commentary on Littleton*, *§148b,* (1853).

¶13 The property division ordered by the District Court is affirmed.

¶14 Kathy asks for her fees on appeal. Where there is a reasonable ground for appeal, a respondent is not entitled to recover attorney's fees under Rule 32, M.R.App.P. *Bailey v.*

---

[1] No one can take advantage of his own wrong.

8

*Ravalli County* (1982), 201 Mont. 138, 147, 653 P.2d 139, 144. We hold that Arden's decision to appeal the judgment of the District Court was not unreasonable. Therefore, Kathy's cross-appeal for attorney's fees and costs is denied.


/S/ JOHN WARNER

We Concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ PATRICIA O. COTTER
/S/ JIM RICE