

DA 09-0349

IN THE SUPREME COURT OF THE STATE OF MONTANA

2010 MT 30

ROBERT ARNOLD,

        Petitioner and Appellant,

    v.

TERRI SULLIVAN,

        Defendant and Appellee.

APPEAL FROM:    District Court of the Eighteenth Judicial District,
                   In and For the County of Gallatin, Cause No. DR 2005-065
                   Honorable Holly B. Brown, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                R. Stan Peeler, Peeler Law Office, Bozeman, Montana

        For Appellee:

                James D. McKenna, McKenna Law Office, P.C., Bozeman, Montana

                         Submitted on Briefs:  January 7, 2010

                                   Decided:  February 9, 2010

Filed:

               _____
                             Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1      Appellant Robert W. Arnold (Bob) filed a petition for dissolution of marriage in the Eighteenth Judicial District Court, Gallatin County, asserting a common law marriage with Appellee Terri J. Sullivan (Terri). Bob also filed a second action against Terri, seeking an accounting, dissolution and distribution of their partnership business and alleging fraud and unjust enrichment. The District Court consolidated these cases and, after an initial hearing, determined that the parties were common law married and had entered into a partnership. Following trial, the District Court dissolved the marriage, ordered the partnership terminated, and determined the accounting and distribution of marital and partnership assets, income, debts and liabilities. Bob appeals the District Court's distribution of property. We reverse and remand for further proceedings.

## PROCEDURAL AND FACTUAL BACKGROUND

¶2      Bob and Terri married in 1986, in Butte, and have one child together, Kelly, in addition to their children from previous marriages. During the marriage, Bob and Terri started an antiques business, called Brass and Wood Antiques, in Bozeman. During their years in marriage and in business, Terri handled all of the marital and business finances. Terri maintained a personal bank account and a business bank account, from which she paid all of the parties' bills and expenses. Terri managed the retail aspects of the business, while Bob oversaw the acquisition and refinishing aspects, including management of the refinishing staff. Bob did not have a banking account, and when he

2

needed money, he would take money out of the business's cash register, a practice which Terri knew about and approved.

¶3 Prior to the marriage, Terri had purchased what became the marital home in Bozeman. Bob and Terri refinanced the home after getting married. In August 1988, Bob and Terri purchased a warehouse building (Warehouse) in Bozeman so that their children would have a place to work on their cars. They leased the land on which the Warehouse sat from Burlington Northern Railroad. In July 1991, Bob and Terri entered into a purchase agreement for the "Stardust Condominium," a building which housed their storefront antiques business. The purchase agreement identified both Bob and Terri as buyers, and Bob paid the $10,000 down payment from the sale of bonds owned by him and his mother.

¶4 In August 1991, before purchase of the Stardust Condominium was finalized, Bob and Terri divorced. Bob was awarded sole ownership of the Warehouse, while Terri was awarded the marital home and the antiques business and inventory. Terri likewise was made liable for the mortgage on the home and for most of the business debt. In October 1991, Terri finalized the condominium purchase with another person, Anne Bates. Despite contributing the $10,000 down payment, Bob was not listed as an owner of the property. There was no written agreement between Bob and Terri regarding the property, and the property settlement agreement did not mention the Stardust Condominium or Bob's down payment.

¶5 About two months after their divorce, Bob and Terri recommenced joint management of Brass and Wood Antiques in the same manner as prior to their divorce. Terri operated the retail portion of the business, while Bob managed acquisitions and refinishing. Terri continued to handle the personal and business finances. Bob and Terri again relied solely on Brass and Wood Antiques for their livelihood. The business continued to pay for Bob's living expenses, and Bob did not receive a set wage, continuing to take spending money from the cash register as needed.

¶6 In 1992, Bob and Terri jointly financed the purchase of the real property on which the Warehouse sat. Despite the joint financing, the property was titled solely in Bob's name. Bob and Terri used the Warehouse to store and refinish business inventory. The purchase debt was subsequently paid off with funds generated by the business.

¶7 In 1994, Bob and Terri closed Brass and Wood Antiques as a storefront business, marketing instead at antique shows. They rented out their space in the Stardust Condominium to another business, and deposited the rents into Terri's account for payment of business and personal expenses, including the mortgage payments on the home. Later that year, Bob moved back into the home, which was occupied by Terri and their daughter. The mortgage payments continued to be paid from business proceeds and rental income until the mortgage was paid off in November 2001. The property remained in Terri's name.

¶8 In January 1997, the parties sold the Stardust Condominium property and purchased what they referred to as the "Four-Plex" property in Bozeman. The sale and

purchase of these properties were configured as a "1031 exchange" for tax purposes. In order to effectuate the 1031 exchange, the excess proceeds from the transaction had to be used to purchase other real property. Thus, Terri "purchased" the Warehouse from Bob for $92,000. The transaction closing statement indicated that Bob was owed $8,800. Terri testified that she saw the closing agent hand Bob a check, but Bob testified that he never received any money, and would have given it to Terri for their mutual finances if he had. After the 1031 exchange, both the Four-Plex and the Warehouse were titled in Terri's name.

¶9     In May 1998, Terri started another storefront antiques business in Bozeman with a friend, Gena Stansbury, called Downtown Antiques. Terri and Gena maintained separate inventories and profits, but shared overhead costs. Bob again acquired and refinished inventory for this business, and advertised the business on the side of his vehicle. He did not receive a wage or salary, but the family and business expenses continued to be paid from the business and rental proceeds.

¶10    From September 1999 until January 2003, Bob was employed as a mail carrier in Bozeman and West Yellowstone. He worked from 30 to 35 hours per week, and deposited his paychecks into a checking account solely in his name at Yellowstone Basin Bank in West Yellowstone. Bob took the job to pay for a pickup truck to be used in the business. In addition to his postal job, Bob continued to work in the antiques business. He left the postal job in 2003 and testified that he then worked substantially more hours in the antiques business.

¶11 Bob and Terri separated permanently in September 2004, at which point Bob stopped working in the business. Terri began a relationship with William Buckmaster and, in January 2005, Buckmaster became a partner with Terri in the business. They subsequently married. Bob filed for dissolution of marriage in February 2005, asserting a common law marriage. He also filed a separate proceeding, alleging fraud and unjust enrichment by Terri, and seeking an accounting, dissolution and distribution of their partnership business. The District Court consolidated the cases.

¶12 After a hearing in April 2007, the District Court determined that the parties were married by common law. While the parties disputed virtually every aspect of the antiques businesses and their real property purchases, the District Court concluded that Bob and Terri were partners in the antiques businesses, each contributing to the partnership in varying amounts of time, effort, skill and money. The District Court found that Bob had continued the same business practices as he had prior to the 1991 divorce, contributed financially to the purchase of the Stardust Condominium, and transferred title of the Warehouse to Terri in order to effectuate the 1031 exchange. The court found that both Bob and Terri worked in and promoted their various business efforts, shared in the business profits, and had commingled their assets and debts within and for the business. Following trial in July 2008, the District Court dissolved the marriage, ordered the partnership terminated, and determined the accounting and distribution of marital and partnership assets, income, debts and liabilities. The parties did not advance arguments

regarding the fraud and unjust enrichment claims during trial, the District Court did not rule upon those claims, and they are not at issue on appeal.

¶13 The District Court awarded Terri the marital home, 75% of the Four-Plex property, the Downtown Antiques business, and 50% of the antiques inventory stored at the Warehouse. Regarding the Downtown Antiques inventory, the District Court awarded half to Terri's husband, William Buckmaster. Of the remaining half of that inventory, the District Court awarded approximately 60% to Terri and approximately 40% to Bob, pursuant to a formula it adopted. Bob was also awarded the Warehouse building and land, 50% of the antiques inventory in the Warehouse, and 25% of the Four-Plex property.

¶14 We state the dispositive issues as follows:

¶15 *1. Did the District Court err by determining the value of the business inventory and in distributing the inventory?*

¶16 *2. Did the District Court err by awarding Terri the entirety of the marital residence?*

**STANDARDS OF REVIEW**

¶17 We review the division of marital property by a district court to determine whether the findings upon which the district court relied are clearly erroneous. *In re Marriage of Clark*, 2003 MT 168, ¶ 7, 316 Mont. 327, 71 P.3d 1228 (citing *In re Marriage of Davis*, 1999 MT 218, ¶ 20, 295 Mont. 546, 986 P.2d 408); *In re Marriage of Bartsch*, 2007 MT 136, ¶ 9, 337 Mont. 386, 162 P.3d 72 (citing *In re Marriage of Horton*, 2004 MT 353,

7

¶ 7, 324 Mont. 382, 102 P.3d 1276). Findings of fact are clearly erroneous if they are not supported by substantial evidence; the district court misapprehended the effect of the evidence; or the district court made a mistake. *Bartsch*, ¶ 9 (citing *Horton*, ¶ 7). Absent clearly erroneous findings of fact, we will affirm the distribution of property unless the district court abused its discretion. If the district court acted arbitrarily without the employment of conscientious judgment, or exceeded the bounds of reason resulting in substantial injustice, we will find an abuse of discretion. *Bartsch*, ¶ 9 (citing *Horton*, ¶ 7); *In re Marriage of Engen*, 1998 MT 153, ¶ 26, 289 Mont. 299, 961 P.2d 738 (citing *In re Marriage of Meeks*, 276 Mont. 237, 242, 915 P.2d 831, 834 (1996)); *Clark*, ¶ 7 (citing *Davis*, ¶ 20).

¶18    We review the district court's interpretation of the law to determine whether the court's interpretations and conclusions are correct. *Clark*, ¶ 8 (citing *Hayes v. Hayes*, 264 Mont. 350, 352, 871 P.2d 913, 914 (1994)); *Bartsch*, ¶ 9 (citing *Horton*, ¶ 7).[1, 2]

**DISCUSSION**

¶19    *1. Did the District Court err in determining the value of the business inventory and in distributing such inventory?*

---

[1] We admonish Appellant's counsel for citing to an unpublished opinion (*Moore v. Moore*, 337 Mont. 531, 168 P.3d 701 (2007)) in violation of Section I, Paragraph 3(c) and (d)(v), of the Montana Supreme Court 1996 Internal Operating Rules, as amended in 2006, in his briefing. Unpublished opinions from this Court are not to be cited as precedent, as clearly indicated in the directive which opens such opinions: "the following decision shall not be cited as precedent." We give no consideration to such citations and our decision here disregards the improper citation and corresponding analysis.

[2] We note that, although this case was a consolidation of partnership accounting and marital dissolution proceedings, the parties rely solely on marital dissolution authorities in support of their arguments, and thus, we have decided the case on that basis.

¶20    Pretrial, the parties stipulated that the value of the inventory of Downtown Antiques was $97,000. They differed slightly about the date of that valuation, with Terri contending this was the value as of September 2004, when she and Bob permanently separated, and Bob contending this was the value as of December 2004. Based upon the parties' stipulation and other evidence, the District Court determined that the inventory was valued at $97,000 as of September 2004, the date which the business and personal relationship between Bob and Terri ended.

¶21    The District Court awarded half of the stipulated value to Terri's husband, William Buckmaster, the current co-partner in the Downtown Antiques business. The court then applied a rather complex formula to compute the division of the remaining half of this inventory between Terri and Bob, based upon the yearly increase in value of the inventory, multiplied by the percentage of Bob's work time dedicated to Downtown Antiques as opposed to his job as a mail carrier. This formula led to an award to Terri of about 60% and to Bob of about 40% of their half. The District Court then awarded possession of this half of the Downtown inventory to Terri, ordering her to pay Bob $19,174 to buy out his 40% interest. Regarding the inventory at the Warehouse, a separate asset, the court awarded each party 50% and granted possession to Bob, ordering him to pay Terri $5,000 to buy out her 50% interest.

¶22    Bob argues the District Court erred by (1) ignoring the stipulation and evidence regarding the $97,000 Downtown Antiques inventory by awarding half to Terri's new partner William Buckmaster; and (2) failing to provide any reason for inconsistently

awarding the parties 50% of the Warehouse inventory but awarding Bob only 40% of the marital share of the Downtown Antiques inventory. Terri argues simply that the District Court properly acted within its broad discretion.

¶23 Section 40-4-202(1), MCA (2003), provides for the equitable distribution of a marital estate in consideration of many factors, such as the duration of the marriage and any prior marriages, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of the parties. The statute commands application of the factors regardless of legal title or marital misconduct, and "embraces the theory that all property is to be distributed equitably, considering all of the circumstances of a particular marriage. The theory of equitable distribution recognizes, and attempts to compensate for, each party's contribution to the marriage." Section 40-4-202(1), MCA; *Bartsch*, ¶ 20. As Terri correctly notes, district courts are vested "with broad discretion to apportion the marital estate in a manner equitable to each party under the circumstances." *Bartsch*, ¶ 9 (citing *In re Marriage of Swanson*, 2004 MT 124, ¶ 12, 321 Mont. 250, 90 P.3d 418).

¶24 Without explanation, the District Court determined that "William Buckmaster owns one-half" of the Downtown Antiques inventory and ordered the value of $48,500 to be distributed to him. This determination runs counter to the District Court's findings that the inventory was valued at $97,000 as of the date the parties separated, and that Buckmaster did not become a partner in Downtown Antiques until January 1, 2005, about four months later. Given these findings, the $97,000 Downtown Antiques inventory

10

should have been a marital asset and distributed accordingly. The contrary conclusions were an abuse of the court's broad discretion to distribute the marital estate.

¶25 We need not resolve Bob's second claimed error regarding the failure of the District Court to explain the inconsistent percentages it applied for distribution of the Downtown Antiques and Warehouse inventories, as our decision herein will require a revised distribution of the inventory in any event. We simply note that, while inconsistencies within the distribution of a marital estate are not error per se, nonetheless a district court must offer findings and reasoning "at least to the point that this Court need not succumb to speculation when assessing the conscientiousness or reasonableness of the district court's judgment." *Bartsch*, ¶ 33 (citing *Larson v. Larson*, 200 Mont. 134, 139, 649 P.2d 1351, 1354 (1982)); *see Bartsch*, ¶ 20 ("an equitable distribution cannot be made by applying some sort of a magic formula"). Here, the District Court did not appear to make such findings regarding the distributions.

¶26 *2. Did the District Court err by awarding Terri all equity in the marital residence?*

¶27 Terri purchased the residence in 1983 and received it as her sole property in the 1991 dissolution proceeding, along with the mortgage debt. Bob returned to the home in January 1994, and lived there until September 2004. The mortgage payments on the home were made from the proceeds of the business, generated by the parties' mutual efforts, until the mortgage was paid off in November 2001. At trial, Bob claimed an equitable portion of the marital residence because of his monetary contributions. The District Court rejected Bob's claim entirely, reasoning that "while Bob's efforts did

11

contribute toward the payment of the mortgage, they did not rise to the level necessary to a share in the marital equity in this dissolution. Terri received the residence as her sole and separate property in the 1991 dissolution and has ultimately been responsible for it since that time." Although recognizing that Terri brought the residence into the second marriage as pre-acquired property, the District Court did not provide any analysis of the statutory provisions or case law governing such property.

¶28 Section 40-4-202(1), MCA, provides the framework for treatment of preacquired or gifted property within a marriage dissolution:

> In dividing property acquired prior to the marriage; property acquired by gift, bequest, devise, or descent; property acquired in exchange for property acquired before the marriage or in exchange for property acquired by gift, bequest, devise, or descent; the increased value of property acquired prior to marriage; and property acquired by a spouse after a decree of legal separation, the court shall consider those contributions of the other spouse to the marriage, including:
> (a) the nonmonetary contribution of a homemaker;
> (b) the extent to which such contributions have facilitated the maintenance of this property; and
> (c) whether or not the property division serves as an alternative to maintenance arrangements.

We have consistently construed this provision to mean that, regardless of who holds title, "assets belonging to a spouse prior to marriage, or acquired by gift during the marriage, are not a part of the marital estate unless the non-acquiring spouse contributed to the preservation, maintenance, or increase in value of that property." *Bartsch*, ¶ 21 (citing *In re Marriage of Rolf*, 2000 MT 361, ¶ 46, 303 Mont. 349, 16 P.3d 345); *In re Marriage of Steinbeisser*, 2002 MT 309, ¶ 37, 313 Mont. 74, 60 P.3d 441 (citing *Rolf*, ¶ 46); *In re Marriage of Foster*, 2004 MT 326, ¶ 11, 324 Mont. 114, 102 P.3d 16 (citing *Engen*, ¶ 29;

12

*In re Marriage of Herrera*, 2004 MT 40, ¶ 23, 320 Mont. 71, 85 P.3d 781); *Clark*, ¶ 18 (citing *Rolf*, ¶ 46; *Steinbeisser*, ¶ 47); *Engen*, ¶¶ 27-42 (collecting cases); *Kelly v. Thompson*, 2009 MT 392, ¶ 23, 353 Mont. 361, 220 P.3d 627 (citing *Foster*, ¶¶ 11, 14; *Engen*, ¶ 29). If the non-acquiring spouse contributes to the property's preservation, maintenance or appreciation, *Engen* and its progeny direct the district court to award the non-acquiring spouse his or her equitable share of that preserved, maintained or appreciated value attributable to his or her efforts. *Engen*, ¶ 29 (collecting cases); *Rolf*, ¶ 46 (citing *Engen*, ¶ 29); *Kelly*, ¶ 23 (citing *Foster*, ¶ 11); *Bartsch*, ¶¶ 21-22 (citations omitted). The non-acquiring spouse, however, is not entitled to a share of the increase in premarital property after marriage when the property's appreciation is due simply to market factors. *Kelly*, ¶ 23 (citing *Foster*, ¶ 14); *see In re Marriage of Dahm*, 2006 MT 230, ¶¶ 24-30, 333 Mont. 453, 143 P.3d 432 (citations omitted).

¶29 The District Court's vague conclusion that Bob's contributions "did not rise to the level necessary to a share in the marital equity" is legally insufficient to defeat the evidence that Bob financially contributed by helping to make the mortgage payments on the house over a number of years, thus preserving the property from foreclosure, and is an error of law. The District Court's findings clearly demonstrate that Bob contributed to both the rental and antique businesses, the proceeds from which were used to pay the mortgage obligation. Given his financial contributions, Bob is entitled to an equitable portion of the home's value which was preserved, maintained or appreciated by his efforts. We express no opinion about the extent of the interest to which Bob's efforts

13

entitle him. On remand, the District Court must make the appropriate factual findings to apply this legal framework.

¶30 Our determination to reverse the two issues stated above requires reversal of the District Court's distribution of the marital estate. We remand for further proceedings consistent with this Opinion. Upon remand, the District Court may, in its discretion, determine whether it is necessary to take further evidence, or whether a new distribution order can be entered upon the evidence previously presented.

¶31 Reversed and remanded.


/S/ JIM RICE


We concur:

/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT
/S/ BRIAN MORRIS
/S/ JAMES C. NELSON